STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
JESSE EDWARD WILSON, DEFENDANT-APPELLANT.

Argued November 5, 1969—Decided September 29, 1970.

42

*Mr. Kenneth S. Javerbaum,* Assistant Deputy Public Defender, argued the cause for defendant-appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney; *Mr. Kenneth S. Javerbaum* on the brief).

*Mr. M. Richard Altman,* Assistant Prosecutor, argued the cause for plaintiff-respondent (*Mr. Joseph P. Lordi,* Prosecutor of Essex County, attorney; *Mr. M. Richard Altman* on the brief).

The opinion of the court was delivered by

PROCTOR, J. Jesse Edward Wilson was found guilty by a jury of first degree murder on two indictments, one for the murder of Esther Friedman and the second for the murder of Shep Binyard. The jury did not recommend life imprisonment and Wilson was sentenced to death on both convictions. His direct appeal to this Court is pursuant to *R. R.* 1 :2–1(c), (now *R.* 2 :2–1(a)(3)). The appeal is from Wilson's second trial. Previously he had been jointly tried with Wilbert Sinclair who had also been indicted for the same crimes, and both men were convicted and sentenced to death. These convictions were reversed because the trial judge failed to instruct the jury on the possibility of returning a verdict of second degree murder. 49 *N. J.* 525 (1967). In the course of our opinion we strongly suggested that the cause of justice would be better served if the defendants were tried separately. *Id.* at 550. Our suggestion was heeded, and it is from the conviction in Wilson's separate trial that he now appeals.

The State's theory at the trial was that Wilson was guilty of felony murder in that the victims were shot by Sinclair while he and Wilson were engaged in an attempt to rob. The principal prosecution witness, Abraham Fried-

man, testified that at about 8:30 P.M. on October 24, 1964, he and his wife, Esther, were working in his package liquor store in Newark. One customer, Shep Binyard, was also in the store. Two men, later identified by Friedman as Wilson and Sinclair, entered the store. Wilson attempted to sit on a chair but fell. Binyard tried to help him up, but Wilson refused the help and got up himself and sat on the chair. Sinclair sought to purchase some "corn whiskey" or "bootleg whiskey," but was refused because Friedman thought Wilson looked "kind of under the weather."

Sinclair then drew a gun and said: "This is a stickup and just be quiet and nobody will get hurt." Mrs. Friedman implored, "Take whatever you want, but just leave us alone." Sinclair then directed Wilson to go behind the counter. Wilson did so and began walking toward the cash register which was on the far end of the counter. At that time Binyard approached Sinclair and said, "Why don't you fellows be nice and leave these good people alone?" As soon as Binyard said this, Sinclair shot and killed him. At this time Wilson was behind the counter in front of the cash register, and he tried to open it. He was at first unable to do so, but after receiving instructions from Friedman, he succeeded. Mrs. Friedman "got sort of hysterical" and ran out of the store screaming for help. Sinclair turned and fired at her. At the time of this shooting, Wilson had his hands in the register. Sinclair ran out of the store, and Wilson was left alone with Friedman. Friedman then picked up a bottle of whiskey and hit Wilson over the head, breaking the bottle. Wilson stood stunned for a moment, and Friedman ran toward a burglar alarm in an icebox at the rear of the store. Wilson followed until Friedman threatened him with the broken bottle which he still held. Wilson stood still for a second or so, looked around the store, and ran out. Friedman then went into the walk-in refrigerator and sounded the burglar alarm. Afterwards, he left the store and found his wife lying on the sidewalk, and with some help from

passersby, he carried her into the store and sat her on a chair. He learned later at the hospital that her wound had been fatal.

The police arrived three to five minutes after the alarm was sounded and questioned Friedman regarding the shootings. They then took him to the hospital to see about his wife's condition. While there he identified Wilson as "the man that was in my store that I hit over the head with the bottle." Wilson was being treated in the hospital for the head injury he received; he had been picked up by the police several blocks from the Friedman store. After he learned that his wife was dead, Friedman was taken back to the store where he, his son, and the porter closed up. As far as he knew, no money had been taken from the cash register. The police then took Friedman and his son to police headquarters where he was shown about six or eight photographs in a group from which he identified Wilson and Sinclair. Friedman then gave a statement to the police. As he was leaving the police station, he happened to look in an interrogating room and saw Sinclair whom he identified.

The State also presented several police officers who went to the store to answer the alarm. Detectives Farese and Moore testified that when they arrived at the store, Friedman told them that there had been a stickup, and "there was shots fired, and his wife got hit and the patron got hit." Friedman was hysterical, worried about his wife, and had to be asked questions three or four times. Moore testified that the cash register was open three or four inches. Officer Di Blasi, a fingerprint identification expert, testified he found no finger prints of value anywhere in the store.

Detectives Alford and Farese testified to the circumstances of Sinclair's arrest over defendant's objections. They said they saw Sinclair walking near his mother's home. They called for him to halt and when he did not they pursued him. About fifty yards away, in a parking lot, Sinclair sat down on a log and threw an object under a car. This object

was later identified by an expert as the gun which killed Mrs. Friedman and probably that which killed Binyard. Sinclair was arrested following his pursuit and taken to police headquarters where he was identified by Friedman.

The State also presented testimony that when Wilson was treated at the hospital for the wound on his head, slivers of glass were found on his jacket. An expert later identified this glass as part of the bottle which Friedman had used to strike the man he identified as Wilson.

The final evidence produced by the State was portions of Wilson's testimony from the first trial. These were read to the jury over defendant's objections. In this prior testimony, Wilson said that he had known Sinclair for about twelve years. On October 23, he left work late in the afternoon and began drinking. Without going into the details, it appears that he went on drinking intermittently until the next evening when the shootings occurred. That night, at about 7:00 o'clock, he and Sinclair went to Wilson's sister's house to get a gun which Wilson had obtained two days before. The sister was not there and they entered by forcing the locked door. The pair then left for a bar where they found Wilson's sister. Wilson testified that while at the bar, he dropped the gun on the floor and that Sinclair picked it up and kept it. Sinclair also obtained the bullets from Wilson, but it is not clear whether these were also picked up off the floor. The next thing Wilson remembered was being on the street with a bleeding head.

The defendant did not take the stand in the present trial but produced several witnesses on his case. Only two gave testimony of any significance. Officer Purcell testified that he responded to the alarm and that when he arrived, two officers were already present at the scene of the crime. He was in the store for about a half hour during which he asked Friedman questions regarding the shootings and listened while the other officers questioned him. Purcell filed a report in which he did not mention any attempted robbery, and he testified that "to the best of my knowledge"

Friedman never told him of any attempted robbery, but rather that Sinclair took out the gun after Friedman refused to sell him liquor.

Milton Unger, a newspaper reporter, testified that in response to questions by himself and police, Friedman gave a version of the events which did not include mention of an attempted holdup or any reference to the opening of the cash register. Friedman had said that the shootings took place after one of the men "took out a gun and demanded liquor."

Although these witnesses were produced to refute the State's theory that there had been an attempted robbery, the jury obviously accepted the State's version of the occurrence. The jury must have believed that Wilson acted in concert with Sinclair in an attempt to rob Friedman's liquor store in order for it to return a verdict of first degree murder. On this appeal the defendant contends that there was insufficient evidence of an attempted robbery, that there were several other trial errors and that his constitutional rights were violated. We will consider these issues in the order raised.

I

■ The defendant first contends that the trial court erred in permitting the State to introduce portions of Wilson's testimony from the prior trial. Defendant concedes the general rule that "statements made by an accused . . . at a former trial, voluntarily, and under such circumstances that he is not deprived of his constitutional right against self-incrimination may be reproduced at a later trial." *Edmonds v. United States,* 106 U. S. App. D. C. 373, 273 *F.* 2d 108, 112–113 (1959) ; *United States v. Grunewald,* 164 *F. Supp.* 644 (S. D. N. Y. 1958). See also *Harrison v. United States,* 392 *U. S.* 219, 88 S. Ct. 2008, 20 *L. Ed.* 2d 1047 (1968) ; 2 *Wharton, Criminal Evidence* § 475 (12th ed. 1955) ; *Annotation,* "Use in Subsequent Prosecution of Self Incriminating Evi-

dence Given Without Invoking Privilege," 5 *A. L. R.* 2d 1404, 1411 (1949). Nevertheless, he contends that in the present case the testimony was inadmissible for several reasons. First, he urges that the State did not establish a foundation of voluntariness before reading the excerpts to the jury. There is no merit to the argument. Defendant was represented by a competent attorney at the first trial and the decision to take the stand at that trial was the same tactical decision which every defendant must make. There is no evidence to indicate that defendant was unfit to make this decision. To the contrary, the court found Wilson competent to stand trial and to consult intelligently with his counsel. See *State v. Sinclair, supra* at 549–50.

Defendant also argues that the admission of his prior testimony constituted comment upon his failure to take the stand in violation of *Griffin v. California,* 380 *U. S.* 609, 85 S. Ct. 1229, 14 *L. Ed.* 2d 106 (1965). We disagree. In *Griffin,* the United States Supreme Court held that it was improper for the prosecutor or the trial judge to call to the jury's attention defendant's failure to take the stand. The decision was never intended to cover a situation such as that here. If defendant's contentions were valid, no confession or admission by an accused could ever be admitted where a defendant failed to take the stand. The constitutional right to remain silent does not shield the defendant from the lawful evidence against him. See *State v. Garvin,* 44 *N. J.* 268, 276–79 (1965).

Finally, defendant contends that the testimony is not admissible under the New Jersey Rules of Evidence. Defendant argues the only rule which is at all applicable is Rule 63(3) which deals with depositions and prior testimony of a declarant. That rule provides, *inter alia,* that where a declarant is unavailable as a witness, his testimony from a prior trial is admissible. Rule 62(6) defines unavailability, and does not include the exercise of a privilege, such as the privilege against self-incrimination in the present case, as a ground for finding a witness to be unavailable. We do not

think that Rule 63(3) is applicable to the present case. The State, when it presents its case in chief cannot be certain whether the defendant will take the stand, and thus the introduction of the testimony cannot hinge upon that choice by the defendant. We think the problem is closer to that involved when confessions are admitted into evidence. In our view there is no real difference between inculpatory statements made at a prior trial and voluntary confessions. If anything, the former are more reliable than the latter since they are made under oath in the solemnity of the court room before judge and jury and in the presence of his own consel. That the statements from the prior trial tended to inculpate Wilson, *e. g.*, that he was with Sinclair prior to the shooting and was the owner of the murder weapon, only tend to increase their reliability. See Rule 63(10) dealing with declarations against interest.

The trial court did not err in admitting the defendant's testimony from the first trial.

## II

The defendant next urges that the trial court erred in instructing the jury on flight. Defendant contends that an instruction regarding flight was improper because the court overlooked a portion of the model instruction distributed by the Administrative Office of the Courts, because there was no evidence to support an inference of flight and because the doctrine of flight only applies when the defendant flees from custody or is found hiding after the crime. The claims are baseless. The administrative bulletin containing the model charge to which defendant refers merely suggests that in deciding whether to give an instruction on flight the trial court should take note that mere departure from the scene of the crime does not itself constitute flight. It is clear that the trial judge in the present case was fully aware of this fact and his instruction to the jury was substantially the

same as that approved by this Court in *State v. Sullivan,* 43 *N. J.* 209, 238–39 (1964). The judge charged that the jury could consider flight "with all of the evidence in the case as a circumstance tending to prove a consciousness of guilt" if it found that the defendant fled "fearing an accusation would be made against him on the charges involved in these indictments or an arrest by reason thereof * * * for the purposes of evading the accusation or arrest." Thus, the jury was required to find not only "departure," but the motive which would turn the departure into flight.

■ Defendant's contention that there was no evidence to support an inference of flight is also without merit. There was ample evidence from which the jury could conclude that Wilson and Sinclair entered Friedman's store to commit a robbery, and that while attempting to carry out that plan, Sinclair shot and killed two persons. Friedman testified that after he struck Wilson with the bottle and retreated toward the alarm in the rear of the store, Wilson came after him. Wilson then looked around, apparently saw that Sinclair had fled, and ran from the store himself. Although the jury could have inferred that Wilson left the store because he was threatened with a broken bottle, it could also readily infer that he fled to avoid apprehension by the police and thereby exhibited consciousness of guilt.

■ Finally, we cannot accept defendant's contention that a charge regarding flight can only be given where an accused flees from custody of where he is found hiding after the crime. A jury may infer that a defendant fled from the scene of a crime by finding that he departed with an intent to avoid apprehension for that crime. It is not necessary that he flee from custody or that he be found hiding. See *State v. Hedinger,* 126 *N. J. L.* 288, 290–291 (Sup. Ct. 1941), *aff'd o. b.* 127 *N. J. L.* 564 (E. & A. 1941); *State v. Copeland,* 94 *N. J. Super.* 196 (App. Div. 1967). See also 2 *Underhill, Criminal Evidence* § 373 (5th ed. 1956).

### III

Defendant's next contention is that certain remarks made by the prosecutor during summation constituted plain error. The prosecutor referred to the defendant as "this, the lion, or the wounded bear * * * whatever animal type he is partaking in now." In the context of this case, we cannot say that the prosecutor exceeded the bounds of fairness and propriety. In his own summation, defendant's counsel used numerous metaphorical references concerning animals. He said that Sinclair had "savagely shot and killed two human beings" but that Wilson had led "a gentle life" rather than "a murderer's course." He asked the jury: "Can you compare the lion with the mouse? Can you compare the falcon with the dove?" It was in apparent response to these remarks that the prosecutor made the challenged comments. While we do not condone this sort of name calling, it is unrealistic to expect that in the context of heated criminal trials it will not occasionally occur. As we said in *State v. Johnson*, 31 *N. J.* 489 (1960): "It is unreasonable to expect that criminal trials will be conducted without some show of feeling. Defense counsel traditionally make dramatic appeals to the emotions of the jury. In these circumstances, a prosecutor cannot be expected to present the State's case in a manner appropriate to a lecture hall." *Id.* at 510–511. Where we have found that a prosecutor in his summation has overstepped the bounds of propriety and created a real danger of prejudice to the accused, we have not hesitated to reverse convictions. *State v. Welsch*, 29 *N. J.* 152 (1959); *State v. Siciliano*, 21 *N. J.* 249 (1956). But not every departure from the facts and reasonable inferences necessarily calls for a reversal, and "on the question whether the improper comment shall have that effect, the making by trial counsel of a timely and proper objection and the action of the trial judge in connection therewith are ordinarily controlling considerations." *State v. Vaszorich*, 13 *N. J.* 99, 119 (1953). In addition

to giving the trial judge an opportunity to take corrective action, a timely objection signifies that the defense believes itself to have been prejudiced by the prosecutor's remarks. Conversely, a failure to object, as here, indicates that in the atmosphere of the trial the defense did not believe that the prosecutor's remarks were prejudicial. *State v. Johnson, supra* at 511. Considering the context in which the prosecutor's remarks were made, and the failure by the defense to object, we do not believe that the defendant was prejudiced or that the jury's ability to rationally evaluate the evidence was impaired.

## IV

Defendant next contends that the trial court erred in permitting testimony over objection concerning the actions of Sinclair following the commission of the crimes and the arrest of Wilson. The trial court allowed several police officers to testify that about two hours after the shooting they saw Sinclair walking near his mother's home, and that after they called for him to stop, he began to run away. Further, they said that just prior to his capture, he was seen to throw an object under a car, the object later being identified as the murder weapon. We think the evidence was properly admitted. Although it is clear that a conspirator's flight may not be admitted against his co-conspirators, *e. g., State v. Simon,* 113 *N. J. L.* 521 (Sup. Ct. 1934), *aff'd* 115 *N. J. L.* 207 (E. & A. 1935), attempts to conceal a weapon or evidence of the crime by a conspirator are admissible. 2 *Wharton, supra* at § 430. 3 *Underhill, supra* at § 864. In the present case the trial court did not instruct the jury on Sinclair's flight. Evidence of Sinclair's running from the police was admitted only to explain the circumstances of his disposal of the weapon. The disposal of the murder weapon by a co-conspirator fleeing from the police is an act in furtherance of the conspiracy and probative against both conspirators. Moreover,

the defendant's objection at trial was too broad. It was not limited to the evidence of Sinclair's running from the police but applied to all the events of his arrest, including the concealment of the murder weapon.

## V

Defendant urges that the trial court erred in denying his motion to eliminate felony-murder from the case. The standard for deciding this question is whether the evidence viewed in its entirety and giving the State the benefit of all favorable inferences which can be reasonably drawn therefrom supports the conviction beyond a reasonable doubt. *State v. Fiorello,* 36 *N. J.* 80, 86–90 (1961), *cert. denied* 368 *U. S.* 967, 82 *S. Ct.* 439, 7 *L. Ed.* 2d 396 (1962). Although the defendant produced two witnesses (Officer Purcell and Unger) whose recollections of Friedman's responses to questioning did not include any mention of an attempted robbery, we think there was ample evidence from which the jury could find that Wilson participated in an attempted robbery during which Sinclair shot and killed two people. Friedman's testimony establishes such an attempt directly and several other police officers corroborated this testimony. Moreover, Wilson admitted having possession of the murder weapon on the night of the killings. The evidence overwhelmingly supported Friedman's testimony, and the jury was entitled to believe him as they did.

## VI

Defendant argues that the exclusion of two veniremen for cause by reason of their position on capital punishment denied him a representative jury, thus violating his rights under the due process and equal protection clauses of the fourteenth amendment.

During the *voir dire* examination 80 veniremen were called; 19 were excused for cause on grounds unrelated to

the death penalty; 26 were challenged peremptorily, eight by the prosecution and 18 by the defense; 21 were excused for cause on the basis of their attitude toward the death penalty. Of the 21, 15 were excused because they said they could not vote for the death penalty regardless of the evidence. Of the remaining six, one was excused because he would never consider life imprisonment. Another admitted that his feelings about the death penalty would prejudice him in determining guilt. A third was excused because he did not believe in capital punishment but his dismissal was consented to by the defense. A fourth was excused because he could not vote for death of an accomplice. The only errors asserted by the defense concern the excusing for cause of the two remaining veniremen, Karl and Johnston. Karl said unequivocably when first examined that in "no circumstances, regardless of what the evidence might disclose" could he vote for a verdict of murder in the first degree knowing that a defendant would suffer the death penalty. Later he said that he "might become emotionally charged enough to do so," but he was unable to assure the court that even in those circumstances he would be able to vote for murder in the first degree knowing that the accused might receive a penalty of death. A similar problem arose with venireman Johnston. At first he said that the death penalty would pose no problem for him. Later he said that he was "undecided" about capital punishment and was unable to come to a conviction on the subject. Still later when questioned as to whether he "could vote for a verdict of murder in the first degree knowing that that individual would suffer the death penalty" he answered, "I would have to say no." Finally, he admitted that he did not know how he would react when confronted with the question. Thus, the questioning of both veniremen elicited responses which were at best equivocal.

In *Witherspoon v. Illinois,* 391 *U. S.* 510, 88 *S. Ct.* 1770, 20 *L. Ed.* 2d 776 (1968), the United States Supreme Court reversed a death sentence where the prosecu-

tion eliminated nearly half the venire of prospective jurors by challenging for cause any veniremen who expressed qualms about capital punishment. This Court first considered the effect of *Witherspoon* upon New Jersey's practice of jury selection in *State v. Mathis,* 52 *N. J.* 238 (1968). There we concluded that our previous cases "define cause in terms agreeable to *Witherspoon"* since before a prospective juror may be challenged for cause it must appear that he is "unable to return a death sentence no matter what may be the facts of the case." *Id.* at 244. We held that if a venireman could not affirmatively say whether he was able to vote for the death penalty where the circumstances warranted it, cause was established. Writing for a unanimous Court, Chief Justice Weintraub said:

"[I]f we accept literally the juror's final statement that he could not definitely say whether he was unable to vote for a death sentence, cause was nonetheless established. The State is entitled to a juror who is impartial, *i. e.,* one who is capable of considering whether the death sentence may be meet. Impartiality is a positive attribute. Its presence must appear affirmatively. If a juror, acknowledging racial, religious, or ethnic bias against an accused, is unable to say whether he could or could not judge the case on the merits, he is not an impartial juror. *So here, the State is entitled to a juror who can at least assure the court that he will judge."* (emphasis added) *Id.* at 248.

Thus, in accordance with *Mathis,* it was not error to excuse veniremen Karl and Johnston for cause since neither could assure the court that he was "capable of considering whether the death sentence may be meet." See also *State v. Artis,* 57 *N. J.* 24 (1970) (slip opinion at 13–14) ; *State v. Forcella,* 52 *N. J.* 263, 291 (1968). In any event, our examination of the *voir dire* satisfies us that the trial judge correctly understood the controlling principles of *Witherspoon* and our cases. And, under these circumstances, even if one or two jurors were erroneously excluded, that does not constitute prejudicial error where, as here, the jury was representative in character. *State v. Mathis; supra* at 249–251.

## VII

Finally, defendant makes several constitutional attacks on the imposition of the death penalty. He concedes that all these arguments were rejected in *State v. Forcella, supra.* These issues are pending before the United States Supreme Court in cases from other jurisdictions. In addition, our decision in *Forcella* was the subject of a petition for *certiorari* and, although Forcella has since died of natural causes, Funicello, who was also involved in the appeal to this Court, is still pursuing the petition for *certiorari.* We understand the petition has not yet been acted upon. In view of these circumstances and since the death penalty is involved, we think the judgment in this case should be withheld until the United States Supreme Court acts. See *State v. Artis, supra,* 57 *N. J.* at 37; *State v. Conklin,* 54 *N. J.* 540, 549–550 (1969).

## VIII

The judgment of the trial court is affirmed but entry of the judgment is to be withheld until further order of this Court.

---

*For affirmance but withholding entry of judgment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.