**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0313-18T1

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

MARK P. MCCAFFREY,

      Defendant-Appellant.

_____

Argued November 14, 2019 – Decided May 18, 2020

Before Judges Whipple, Gooden Brown, and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 14-11-2855.

David Anthony Gies, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; David Anthony Gies, on the briefs).

Valeria Dominguez, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Kayla E. Rowe, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Following a bifurcated jury trial, defendant was convicted of first-degree attempted murder, N.J.S.A. 2C:11-3(a)(1) and N.J.S.A. 2C:5-1 (count one); third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2) (counts two and four); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count five); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count six); and fourth-degree possession of a weapon by a convicted person, N.J.S.A. 2C:39-7(a) (count seven). The convictions stemmed from defendant stabbing two men, one in the chest, during an altercation in a parking lot at a bar. Defendant left the scene after the stabbing. After denying defendant's motion for a new trial, R. 3:20-1,[1] the trial judge sentenced defendant to an aggregate twelve-year term of imprisonment, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.[2]

On appeal, defendant raises the following points for our consideration:

POINT ONE

---

[1] Defendant's earlier motion at the close of the State's case for a judgment of acquittal, pursuant to Rule 3:18-1, was also denied.

[2] After appropriate mergers, defendant was sentenced to a twelve-year NERA sentence on count one, a concurrent five-year sentence each on count four and five, and a concurrent one-year sentence on count seven.

THE TRIAL COURT'S FAILURE TO CAUTIOUSLY CONSIDER WHETHER THE PROBATIVE VALUE OF THE EVIDENCE OF FLIGHT WAS SUBSTANTIALLY OUTWEIGHED BY ITS INHERENT PREJUDICE IS REVERSIBLE ERROR.

POINT TWO

NOT ONLY WAS DEFENDANT UNDULY PREJUDICED BY THE STATE'S REQUEST FOR A FLIGHT CHARGE AFTER CLOSING ARGUMENTS, BUT THE TRIAL COURT ERRED WHERE IT DID NOT INSTRUCT THE JURY WITH RESPECT TO DEFENDANT'S REASONABLE EXPLANATION FOR HIS DEPARTURE FROM THE SCENE.  (NOT RAISED BELOW).

POINT THREE

THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY THAT DEFENDANT'S TWO PRIOR CONVICTIONS COULD BE USED ONLY AS EVIDENCE PROBATIVE OF HIS CREDIBILITY IS PLAIN ERROR.  (NOT RAISED BELOW).

POINT FOUR

A RATIONAL BASIS EXISTS TO INSTRUCT THE JURY ON SELF-DEFENSE.  (NOT RAISED BELOW).

POINT FIVE

THE TRIAL COURT'S DENIAL OF DEFENDANT'S NEW TRIAL MOTION IS A MISCARRIAGE OF JUSTICE AND WARRANTS REVERSAL.

POINT SIX

3

THE TRIAL COURT ERRED WHERE IT DID NOT CONSIDER MITIGATING FACTOR [FIVE] IN SENTENCING DEFENDANT TO TWELVE YEARS ON THE ATTEMPTED MURDER OFFENSE. (NOT RAISED BELOW).

Having considered the arguments and applicable law, we affirm.

I.

We glean these facts from the trial record. In the early morning hours of June 7, 2014, Evan Lubin, Jr. and Gerard Pasqualini were stabbed during an altercation in the parking lot of Hemingway's Cafe, a bar in Seaside Heights. The previous night, Lubin agreed to go to Hemingway's with friends to celebrate his recent college graduation. To that end, at about 11:30 p.m., Lubin, Eliezer Cepeda, Jr., and Janella Gunter met Kimberly Waller at Waller's house. According to Lubin, although "the original plan" did not include defendant, Waller's boyfriend, defendant decided to join them. As a result, Waller drove to the bar with defendant in her car,[3] while Lubin, Cepeda and Gunter drove in a separate vehicle. Before getting into their respective vehicles, defendant spontaneously told Lubin that "he had a knife and a gun in the car."

The parties arrived at the bar after midnight. Shortly after arriving, they went their separate ways, with Lubin and Cepeda going one way and Gunter,

---

[3] Waller's sister was the owner of the car.

Waller, and defendant another. During the night, defendant and Waller argued over Waller's flirtatious behavior. Defendant later separated from the group when he observed Waller "dancing with another guy," who was an old friend of hers. At around 2:45 a.m., when the bar was about to close, Lubin and Cepeda reunited with Gunter and Waller at the exit doors. Upon seeing how inebriated Waller was, Lubin "decided to walk [her] to her car." As they proceeded to the parking lot, Waller continued to talk to her old male friend, and "flirt[ed]" with a police officer who cautioned her against driving before "he drove off." At that point, defendant was already outside. When he observed Waller's interaction with her male friend, defendant approached and started "yelling" at them.

Eventually, Waller sat in the rear passenger seat on the driver side of her car and Gunter jumped into the driver seat, after Lubin told Waller "not to drive" and suggested instead that she allow Gunter to drive her home while he followed. Angered by Lubin's interference, defendant, who was then seated in the front passenger seat of Waller's car, cursed at Lubin and threatened to "f*** [him] up." Lubin ignored defendant and walked away with Cepeda as Gunter "started pulling out" of the lot. While Lubin was walking away, Waller's car came to a stop and he observed defendant and Waller engaged in a physical altercation inside, prompting him to intervene to try "to diffuse" the situation.

Consequently, Lubin placed his right hand on the roof of the car, leaned into the open window on the passenger side of the car where defendant was seated, and told them to "calm down." In response, defendant "grabbed [Lubin's] shirt" with his right hand, told Lubin to "get away from [him]," threatened to "kill [him]," called him a "nigga,"[4] and then "swung" his left hand twice "real fast" towards Lubin.

Although Gunter and Cepeda recalled Lubin and defendant exchanging punches after defendant called Lubin a "nigger," Lubin testified that when he lifted his arm to try to "punch" defendant, he felt a sensation like "electricity" and "immediately noticed [he] couldn't even hold a breath." As Lubin retreated towards his car, he observed "blood everywhere" and realized he had been stabbed by defendant. While he walked away, Lubin noticed "three" or "four people" run towards Waller's car and "punch [defendant] through the window." Gunter described the scene as "a herd of people coming towards the passenger side of the car and . . . hitting [defendant]," and Cepeda testified he saw "these other guys" come "out of nowhere," "jump[] in the car, and . . . hit[] [defendant]."

---

[4] Lubin is African American and defendant is Caucasian.

The second victim, Pasqualini, was not part of the original group, but met Waller and Gunter, with whom he was previously acquainted, as they were leaving Hemingway's. Pasqualini noticed that Waller was "a little intoxicated" when she was "talking to a police officer," who told Pasqualini to not "let her drive." Although none of the other witnesses recalled his involvement, Pasqualini testified that, as a result of the police officer's order, he helped Waller into the rear passenger seat of her car, while Gunter was seated in the driver seat and defendant in the front passenger seat. Before Waller's vehicle left the parking space, Pasqualini was "leaning up against the car" on the passenger side talking to Gunter when he heard a "commotion" stemming from Waller and defendant arguing inside the vehicle. "[A]ll of a sudden [he] felt a blow to [his] right bicep," but did not know what had happened. When he was "hit" a second time, he noticed he was "bleeding everywhere," realized he had been stabbed by defendant, and promptly retreated "from the whole situation." Pasqualini did not know Lubin or Cepeda and did not recall seeing anyone else near the car at that point.

After the stabbing, Gunter tried "to drive off," but defendant "pushed [Gunter] out of the car," "jump[ed] into the driver's seat before [she] could even get off the ground," and "took off," almost "run[ning] over [her] feet." When

Gunter looked down at her hand, which defendant had forcibly removed from the gearshift before shoving her out of the car, it was bleeding.

Lubin received emergency aid for his wounds at the scene from "EMT personnel," who observed two "puncture" wounds in "his chest" and "a five-centimeter laceration to his right forearm." Lubin was then transported to Jersey Shore Medical Center by helicopter because his injuries were deemed life-threatening. He remained in the hospital for five days, and subsequently underwent "nerve surgery on [his] arm" to correct a "severed" "ulnar nerve." Pasqualini was transported to Community Medical Center by ambulance. He suffered "two stab wounds, one to the back of the right . . . . [t]ricep" and "one to the bicep," which required stitches and staples.

During the five-day trial, along with two crime scene investigation detectives, a DNA expert, and a paramedic, Gunter, Cepeda and both victims testified for the State. Waller and defendant testified for the defense. For the most part, Lubin's, Gunter's, and Cepeda's testimony were consistent in describing the events leading up to and the aftermath of the stabbing, as well as defendant's and Lubin's interaction during the actual stabbing. Pasqualini testified about his involvement in the melee and his resulting injuries. All four

8

witnesses acknowledged they did not see a knife in defendant's hand, and no knife was ever recovered.[5]

Physical evidence collected from the scene included "blood swabbings" from "blood pool[s]" and "blood trails," as well as a "blood[-]soaked" "shirt" retrieved from a "garbage can." Inside Waller's vehicle, "red staining, consistent with blood," was swabbed from various parts of the vehicle, including "the front passenger side door," "the dashboard on the front passenger side," and the "A-pillar." Subsequent DNA testing of blood stains recovered from the car matched Lubin and Pasqualini, and defendant "matche[d] the minor DNA profile" obtained from one specimen.

Waller's account of the night's events differed from the State's witnesses, in that Waller denied seeing defendant stab anyone. According to Waller, they all left Hemingway's together around closing time and proceeded to the parking lot. While defendant was seated in the front passenger seat, Gunter in the driver seat, and Waller in the rear passenger seat of her car, there were "a bunch of guys standing around the car" arguing with defendant. All of a sudden, defendant and a "guy start[ed] going at it" and defendant "burst[ed] out the N

---

[5] Just prior to the stabbing, Gunter observed defendant "reach[] for his pocket" and "pull[] something out" but she "did not know what the object was."

word." In response, "the guys . . . jumped the car, . . . punching [defendant] back and forth through the car," while defendant attempted to "block [the] punches." During the chaos, Gunter "tried to drive off" but later "got out [of] the car," prompting defendant to "jump[] over to the driver's [seat]" and "dr[i]ve off." Waller testified defendant drove off "because of the guys jumping all over the car." Waller denied ever seeing defendant with a knife, did not recall seeing Lubin or Pasqualini by her car, and did not see defendant hit anyone. However, after the incident, Waller found a watch in her car that Pasqualini identified as the watch he was wearing when he was stabbed.

Defendant corroborated Waller's account of the incident, explaining that after the bar let out, people were walking towards their cars, "talking crap to each other" and hassling back and forth. To avoid a confrontation with anyone, defendant exchanged a few words, "[j]ust trying to get people away from [him]," and tried to get to Waller's car as quickly as possible. Once he was seated in the front passenger seat, Waller in the rear passenger seat, and Gunter in the driver seat, Gunter "drove a few feet" and "stop[ped] the car." "As soon as she stopped," "people on both sides" "came through the windows" and "attacked [him] from both sides." According to defendant, as he was being punched, he "[got] over to the driver's seat" and "[took] off" because Gunter "just froze up"

10

and then "jumped out [of] the car." Although he did not "know exactly how many people were actually there," defendant testified there were so many people that he could not see anything "but people around the car and if [he] didn't get into that driver's seat, [he] would have probably died right there."

Defendant denied threatening anyone and did not recall using the "N word," but explained that if he did, "it was not in any racial terms." Defendant denied having a knife, denied stabbing Lubin, whom he described as "the kind of kid that nobody would have a problem with," and denied stabbing Pasqualini, whom he claimed he did not even know. Defendant denied arguing with either victim, and denied putting his hands on anyone, explaining that he only "put [his arm] up over [his] head" to block the blows from the mob. Although defendant did not complain of any injuries to Waller, who did not observe any injuries or blood on defendant after they left the parking lot, defendant testified that he went to the emergency room the following day because "[he] was stabbed [in] a few different places" and "[his] mouth was . . . sliced open in the inside, where [he] was hit." Defendant acknowledged that he did not call the police after being attacked, but explained that he did not want to be involved in any altercation because "[he] was on probation." When he was contacted by the police the

following day and questioned about the incident, for the first time, he told the officer that he was the victim.

II.

In Points One and Two, defendant argues that because "the probative value of defendant's departure was substantially outweighed by its undue prejudice," a "flight charge should not have been given." Further, by "not instruct[ing] the jury regarding defendant's explanation for his departure," the judge "failed to carefully craft" the flight charge "to ameliorate the potential prejudice."

We review a trial court's decision to give a flight charge for abuse of discretion. State v. Long, 119 N.J. 439, 499 (1990). Under that "deferential standard of review," we will not reverse the trial court's decision unless we find that the ruling "'was so wide of the mark that a manifest denial of justice resulted.'" State v. Marrero, 148 N.J. 469, 484 (1997) (quoting State v. Kelly, 97 N.J. 178, 216 (1984)).

An instruction on flight "is appropriate when there are 'circumstances present and unexplained which . . . reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt.'" State v. Latney, 415 N.J. Super. 169, 175-76

12

(App. Div. 2010) (alteration in original) (quoting State v. Mann, 132 N.J. 410, 418-19 (1993)). For the circumstances to justify the inference and provide a legal basis for the flight charge, the circumstances need not constitute unequivocal proof of a consciousness of guilt. State v. Ingram, 196 N.J. 23, 46 (2008) (citing State v. Wilson, 57 N.J. 39, 49 (1970)). However, while the evidence of flight need not be unequivocal, it "must be intrinsically indicative of a consciousness of guilt." State v. Randolph, 228 N.J. 566, 595 (2017) (citation and internal quotation marks omitted).

"Departure from the scene after a crime has been committed, of itself, does not warrant an inference of guilt." State v. Sullivan, 43 N.J. 209, 238 (1964). "For departure to take on the legal significance of flight, there must be circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt." Ingram, 196 N.J. at 46 (quoting Mann, 132 N.J. at 418-19). Thus, a jury must be able to find departure and "the motive which would turn the departure into flight." Wilson, 57 N.J. at 49.

Our Supreme Court has instructed that "[t]he potential for prejudice to the defendant and the marginal probative value of evidence of flight or escape

mandate careful consideration of the nature of the evidence to be admitted and the manner in which it is presented." Mann, 132 N.J. at 420. "In such cases, the Court has mandated 'a strong limiting instruction . . . informing the jury that it should not draw any inference of consciousness of guilt by defendant from his post-crime conduct unless it believes that defendant acted to cover up a crime.'" State v. Cole, 229 N.J. 430, 454 (2017) (alteration in original) (quoting State v. Williams, 190 N.J. 114, 134 (2007)). On the other hand, the Court has acknowledged that the "total exclusion of [highly prejudicial but probative] evidence is error where prejudice can be minimized through limiting instructions or other means." Id. at 455 (quoting Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 5 on N.J.R.E. 403 (2016)).

Thus, the propriety of admitting the evidence and delivering a flight charge

> depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.
>
> [Latney, 415 N.J. Super. at 176 (emphasis omitted) (quoting Mann, 132 N.J. at 420).]

14

Here, defendant's departure from the scene was undisputed. Although defendant denied stabbing anyone and explained that he drove off to escape the angry mob attacking him, based on the State's proofs, after stabbing the two victims, defendant forcibly removed Gunter's hand from the gearshift, shoved her out of the car, and took off, leaving her on the ground bleeding and without any regard for her safety. Further, defendant did not promptly report his purported victimization to police, explaining that he did not want to be involved because he was on probation. Defendant only claimed he was a victim when police contacted him about the incident the following day.

We are satisfied there was substantial evidence of "unexplained circumstances" beyond mere departure which reasonably supported an inference that defendant fled with a consciousness of guilt. While the jury could have inferred that defendant departed out of fear of being injured or killed by the mob, it could also readily infer that he fled the scene to avoid apprehension and thereby exhibited consciousness of guilt. Indeed, it is not necessary that the circumstances accompanying departure constitute unequivocal proof of consciousness of guilt. Ingram, 196 N.J. at 46 (citing Wilson, 57 N.J. at 49 ("A jury may infer that a defendant fled from the scene of a crime by finding that he

15

departed with an intent to avoid apprehension for that crime. It is not necessary that he flee from custody or that he be found hiding.")).

The fact that evidence supported alternative reasons for defendant's departure from the scene does not rule out an instruction on flight or render its issuance impermissible. The State requested the charge and the judge agreed to give it over defense counsel's objection. Although defense counsel objected to including the charge, even he candidly acknowledged that "if . . . asked," the judge "ha[d] to charge . . . it[]." Given the equally plausible reasons for defendant's departure from the scene, the judge was justified in giving a flight instruction, and appropriately instructed the jury as to what inferences could be drawn from the flight evidence depending upon how it resolved the factual dispute. Thus, we discern no abuse of discretion in the judge's decision to give a flight instruction based on our "careful consideration" of "[t]he potential for prejudice" to defendant and the "probative value" of the flight evidence. Mann, 132 N.J. at 420.

For the first time on appeal, defendant challenges the actual flight charge given by the judge. Because defendant failed to object to the language in the charge at trial, we review the claim under the plain error standard. Plain error is that which is "clearly capable of producing an unjust result." State v.

Whitaker, 200 N.J. 444, 465 (2009) (quoting R. 2:10-2). In applying that standard to an erroneous jury instruction, we examine the record to determine whether "legal impropriety in the charge prejudicially affect[ed] the substantial rights of the defendant and [was] sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Hock, 54 N.J. 526, 538 (1969); see also State v. Nero, 195 N.J. 397, 407 (2008).

The charge given by the judge, which substantially tracked the model jury charge on flight, Model Jury Charge (Criminal), "Flight" (rev. May 10, 2010), was as follows:

> There has been some testimony in the case from which you may infer that the defendant fled shortly after the alleged commission of the crime. The defendant denies that the acts constituted flight. The question of whether the defendant fled after the commission of the crime is another question of fact for your determination.
>
> Mere departure from a place where a crime has been committed does not constitute flight. If you find that the defendant, fearing that an accusation or arrest would be made against him on the charge involved in the indictment, took refuge in flight for the purpose of evading the accusation or arrest on that charge, then you may consider such flight in connection with all the other evidence in the case, as an indication or proof of consciousness of guilt.

> Flight may only be considered as evidence of consciousness of guilt if you should determine that the defendant's purpose in leaving was to evade accusation or arrest for the offense charged in the indictment.

Defendant argues the judge's flight charge was "inadequate." According to defendant, the judge's "omission of defendant's explanation left the jury without any judicial guidance on the proper context in which to consider the evidence of flight." Although defendant never requested it at trial, the portion of the model jury charge defendant now asserts should have been given by the judge provides:

> There has been some testimony in the case from which you may infer that the defendant fled shortly after the alleged commission of the crime. The defense has suggested the following explanation:
>
> (SET FORTH EXPLANATION SUGGESTED BY DEFENSE)
>
> If you find the defendant's explanation credible, you should not draw any inference of the defendant's consciousness of guilt from the defendant's departure.
>
> [Ibid.]

It is axiomatic that "[a]ppropriate and proper charges are essential for a fair trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (quoting State v. Reddish, 181 N.J. 553, 613 (2004) (alteration in original)). Proper instructions consist of "a comprehensible explanation of the questions that the jury must determine,

18

including the law of the case applicable to the facts that the jury may find." Id. at 159 (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). "[T]he court has an 'independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party.'" Ibid. (alteration in original) (quoting Reddish, 181 N.J. at 613); see also State v. Scharf, 225 N.J. 547, 580 (2016).

"Because proper jury instructions are essential to a fair trial, 'erroneous instructions on material points are presumed to' possess the capacity to unfairly prejudice the defendant." Baum, 224 N.J. at 159 (quoting State v. Bunch, 180 N.J. 534, 541-42 (2004)); see also State v. McKinney, 223 N.J. 475, 495 (2015). However, when there was no objection to the charge, as here, we "presum[e] that the charge was not error and was unlikely to prejudice the defendant's case." State v. Young, 448 N.J. Super. 206, 224-25 (App. Div. 2017) (alteration in original) (quoting State v. Singleton, 211 N.J. 157, 182 (2012)).

A jury "charge must be read as a whole in determining whether there was any error," State v. Torres, 183 N.J. 554, 564 (2005), and the effect of any error "must be evaluated in light 'of the overall strength of the State's case,'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289

(2006)). "There is no reversible error 'where the charge, considered as a whole, adequately conveys the law and is unlikely to confuse or mislead the jury, even though part of the charge, standing alone, might be incorrect.'" Mogull v. CB Commercial Real Estate Grp., Inc., 162 N.J. 449, 464 (2000) (quoting Fischer v. Canario, 143 N.J. 235, 254 (1996)).

Pertinent to the issue raised on appeal, "[a]n adequate [flight] instruction would require the jury first to find that there was a departure, and then to find a motive for the departure, such as an attempt to avoid arrest or prosecution, that would turn the departure into flight." Mann, 132 N.J. at 421. When a defendant offers an explanation for his departure, "the trial court should instruct the jury that if it finds the defendant's explanation credible, it should not draw any inference of the defendant's consciousness of guilt from the defendant's departure." Ibid.

In State v. Leak, we acknowledged that "[t]he charge delivered . . . was poor in that it did not clearly apprise the jury that if they credited the explanation of any of the defendants for his or her flight . . . , they should not draw any inference relative to guilt against such defendant." 128 N.J. Super. 212, 217 (App. Div. 1974). However, "on the case as a whole," we concluded that the charge had no "prejudicial effect" to warrant reversal of the convictions because

"the jury probably drew that meaning from the portion of the charge wherein it was informed by the court that it should 'consider' defendants' 'explanation . . . as to why they considered the actions and did certain things at that particular time.'" Ibid.

Here, we agree with defendant that the judge erred in omitting his explanation for his departure in the flight charge. The judge should have advised the jury of defendant's alternative explanation that was supported by the evidence. However, like Leak, we conclude that the charge withstands plain error scrutiny because the jury heard the explanation when defendant testified, and the jury probably drew the requisite meaning from the judge's instruction that "defendant denie[d] that the acts constituted flight," that "[m]ere departure from a place where a crime has been committed does not constitute flight," and that "[f]light may only be considered as evidence of consciousness of guilt if [the jury] should determine that the defendant's purpose in leaving was to evade accusation or arrest for the offense charged in the indictment." When considered as a whole, the charge, while "poor," ibid., conveyed the essential principle that the jury must first "find that there was a departure," and then determine the "motive for the departure, such as an attempt to avoid arrest or prosecution, that would turn the departure into flight." Mann, 132 N.J. at 421. Thus, we are

21

satisfied that the omission of defendant's explanation for fleeing the scene was not clearly capable of producing an unjust result.

Defendant also argues for the first time on appeal that "[t]he State's untimely request" for the flight charge as well as "the State's unexpected prejudicial comments regarding flight" during its summation "unfairly prejudiced defendant and amounted to reversible error." In its summation, the prosecutor commented:

> Also, you can consider the defendant's conduct immediately after the incident to find purpose. And I submit to you, ladies and gentlemen, he fled and that, you can infer consciousness of guilt. He did[ not] say, oh, my gosh, I just stabbed somebody after the first stab. He did[ not] say, oh, my gosh, I just stabbed you again after the second or, oh, no, a third time. No, he fled, ladies and gentlemen. He fled. He did[ not] call 911. He did[ not] say, hey, there was an incident, there was an accident, something happened, someone[ is] bleeding. He left.

"Prosecutors may not make inaccurate factual or legal assertions during summation, and they must confine their remarks to evidence revealed during trial, and reasonable inferences to be drawn from the evidence." State v. Rodriguez, 365 N.J. Super. 38, 48 (App. Div. 2003) (citing State v. Smith, 167 N.J. 158, 178 (2001)). "If no objection is made, the remarks usually will not be deemed prejudicial." State v. Ramseur, 106 N.J. 123, 323 (1987).

A-0313-18T1

Here, we are satisfied the prosecutor's remarks were factually and legally supported by the evidence adduced at trial. The absence of any objection when the remarks were made underscores our conclusion that the remarks were proper, and not deemed prejudicial by defense counsel at the time. See State v. Timmendequas, 161 N.J. 515, 575 (1999) ("To justify reversal, the prosecutor's conduct must have been 'clearly and unmistakably improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense.").

More troubling is the timing of the prosecutor's request for the flight charge. Following summations, the prosecutor requested that the flight charge be included during a charge conference conducted immediately prior to the final charge. A prior charge conference had been conducted after the defense rested its case the day before. While defense counsel objected to including the charge, he did not object to the timing of the request or seek any remedial action. The judge noted that he was "not surprised by th[e] request" and agreed to include flight in the final charge.

Rule 1:8-7(b) provides:

> Prior to closing arguments, the court shall hold a charge conference on the record in all criminal cases. . . . At the conference the court shall advise counsel of the offenses, defenses and other legal issues to be charged

A-0313-18T1

and shall rule on requests made by counsel. . . . Any party, at or before commencement of trial, may submit written requests that the court instruct the jury on the law as set forth in the requests. As to issues not anticipated prior to trial, any party may submit written requests before closing arguments.

Where the court decides sua sponte or grants a request to charge the jury on a new charge after the completion of summations, "counsel should be afforded an opportunity to make responsive supplemental closing statements." Pressler & Verniero, Current N.J. Court Rules, cmt. 2.3 on R. 1:8-7 (2019). See also State v. Rovito, 99 N.J. 581, 588 (1985) (holding that "[a]lthough the better practice is for the court to resolve all questions about the proposed charge before summations," the court's decision to "permit counsel to conform their summations to the charge" was consistent with the spirit of Rule 1:8-7).

Here, contrary to Rule 1:8-7(b), the State did not request the flight charge until after closing arguments. Additionally, the judge did not offer defense counsel an opportunity to supplement his summation. See State v. Hakim, 205 N.J. Super. 385, 389 (App. Div. 1985) (pointing out that Rule 1:8-7 allows "the parties [to] prepare to comment on the [new] issue . . . during summations."). However, we are persuaded that the error does not constitute plain error in the circumstances of this case. Throughout the trial, both the State and defendant presented evidence regarding defendant's departure from the scene. Indeed, the

24

crux of the defense was that defendant had nothing to do with the stabbings and departed the scene to escape an angry mob. Consequently, inasmuch as the flight charge was amply supported by the evidence, we are satisfied defendant was neither surprised nor prejudiced by the State's request, and the error was not "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2.

In Point Three, defendant argues that the judge's "failure to instruct the jury on the limited purpose for which his prior convictions could be used" constituted reversible error. According to defendant, without the instruction, the jury did not "underst[an]d the limited use of defendant's prior convictions as evidence only of his credibility and not of his criminal disposition."

Following a pre-trial Sands/Brunson[6] hearing, the judge ruled that defendant's 2002 conviction for a third-degree drug distribution offense, for which "defendant received a four-year probationary sentence," and his 2013 conviction for third-degree "insurance fraud" were admissible if defendant elected to testify at trial pursuant to N.J.R.E. 609, permitting the admission of a witness's prior conviction for impeachment purposes. The judge determined that

---

[6] State v. Sands, 76 N.J. 127 (1978); State v. Brunson, 132 N.J. 377 (1993).

 A-0313-18T1

while the former conviction was subject to "sanitization," the latter was not as it "involved a crime of dishonesty, lack of v[e]racity, or fraud."

At trial, questioning on defendant's prior convictions was limited to the following colloquy during defendant's direct examination:

> [Defense counsel:] . . . [Y]ou have a third[-]degree conviction back in 2002. Is that correct, sir?
>
> [Defendant:] Yes.
>
> [Defense counsel:] And you also have a fraud conviction in 2013, that you received probation on, a third[-]degree offense as well. Is that correct?
>
> [Defendant:] Yes.

The prosecutor did not cross-examine defendant on the prior convictions to impeach his credibility, and neither party commented on the convictions during summations.

Because defense counsel neither requested the limiting instruction nor objected to its omission at trial, we review this issue under a plain error standard. See State v. R.K., 220 N.J. 444, 456 (2015) ("When a defendant fails to object to an . . . omitted limiting instruction, it is viewed under the plain-error rule, [t]hus, the error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached." (first citing R. 2:10-2, then citing State v. Daniels, 182 N.J. 80, 95 (2004))).

26                                                          A-0313-18T1

"Where evidence is admitted for specific use only, the judge must so instruct the jury." Pressler & Verniero, cmt. 9.3 on R. 1:8-7. The Brunson Court "[r]ecogniz[ed] that a jury might use a prior conviction as evidence of a defendant's criminal disposition and not as evidence probative of a defendant's credibility." 132 N.J. at 390. In order to mitigate the prejudice, the Court reiterated that "the trial court must explain carefully to the jury the limited purpose of prior-conviction evidence." Id. at 385 (citing Sands, 76 N.J. at 142 n.3). However, in other contexts, the Court has noted that "while a court must give a limiting instruction, if warranted, despite the lack of a request," there is no requirement that "a court should provide an instruction despite a party's calculated decision to waive it." State v. Brown, 138 N.J. 481, 535 (1994), overruled on other grounds, State v. Cooper, 151 N.J. 326, 377 (1997).

Here, we are convinced that the omission of the limiting instruction does not rise to the level of plain error. First, because the prosecutor did not cross-examine defendant on the prior convictions, it is likely defense counsel did not request a limiting instruction as a matter of strategy to avoid drawing attention to them. Secondly, neither conviction was substantially similar to the charges being tried. See Brunson, 132 N.J. at 391 (noting that "[t]he introduction into evidence of a similar prior conviction to impeach a testifying defendant is

27

doubtless highly prejudicial, and that prejudice is unlikely to be cured by a limiting instruction").

Finally, both victims had prior criminal convictions that were also presented to the jury. In 2012, Lubin was convicted of "fourth[-]degree" "hindering," for which he received a one-year probationary sentence. In 2015, he was convicted of "fourth[-]degree" operating a motor vehicle "while [his] license was suspended for a second or subsequent" driving while intoxicated violation, for which he served a "six[-]month[]" jail sentence. As to Pasqualini, in 2010, he was convicted of "unlawful possession of a weapon" and was "sentenced to a one-year probationary term." In October 2015, he was "sentenced to another one-year probationary term for receiving stolen property, [third-degree] unlawful possession of a rifle, . . . and possession with intent to distribute [controlled dangerous substances]." In December 2015, he "receive[d] two years['] probation for a burglary and a theft."

Under these circumstances, we cannot conclude that the judge's failure to give a limiting instruction sua sponte warrants reversal of the convictions. See State v. Morton, 155 N.J. 383, 452 (1998) (finding no "plain error in the court's failure to provide a limiting instruction dealing specifically with defendant's plans to [commit other crimes]"); State v. Nelson, 318 N.J. Super. 242, 254

(App. Div. 1999) ("When, as here, a limiting instruction should have been given, even though it was not requested, the 'failure to do so is not per se plain error . . . .'" quoting State v. Allison, 208 N.J. Super. 9, 18 (App. Div. 1985)); State v. Montesano, 298 N.J. Super. 597, 617-18 (App. Div. 1997) (finding no plain error where court failed to give a limiting instruction sua sponte that the co-defendant's voluntary written statement could not be used against defendant).

In Point Four, defendant argues for the first time on appeal that the judge erred by "not instruct[ing] the jury on self-defense." According to defendant, because "[a]rguably Pasqualini and Lubin were the aggressors," all three were "bloodied," and no one ever "observe[d] defendant with a knife," "a rational basis exist[ed]" to support the charge.

"If a 'self-defense charge is requested and supported by some evidence in the record, it must be given.'" State v. Fowler, 239 N.J. 171, 185 (2019) (quoting State v. Rodriguez, 195 N.J. 165, 174 (2008)). "However, absent a request from the parties, 'evidence must "clearly indicate[]" such a defense' to warrant a self-defense instruction." Ibid. (alteration in original) (quoting State v. Galicia, 210 N.J. 364, 390-91 (2012)). Cf. State v. Gentry, 439 N.J. Super. 57, 63 (App. Div. 2015) (holding that a self-defense instruction is required, even when not requested, where the evidence indicates a rational basis for instructing it).

"[U]nder the Criminal Code 'the use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.'" Fowler, 239 N.J. at 185 (emphasis omitted) (quoting N.J.S.A. 2C:3-4(a)).[7] Viewed in a light most favorable to the defendant, if such evidence is present, "then the jury must be instructed that the State is required to prove beyond a reasonable doubt that the self-defense claim does not accord with the facts[, and] acquittal is required if there remains a reasonable doubt whether the defendant acted in self-defense." State v. Kelly, 97 N.J. 178, 200 (1984).

Here, defendant unequivocally denied stabbing Lubin or Pasqualini, denied having any physical altercation with either, and denied possessing a knife on the night in question. Defendant's account was corroborated by Waller. Given this defense, which is entirely incompatible with a claim of self-defense, we find no reversible error in the judge's failure to charge self-defense in the absence of a request by defense counsel or an objection to its omission. "Trial courts must carefully refrain from preempting defense counsel's strategic and

_____

[7] Notably, defendant never served the State with the notice required under Rule 3:12-1, when "the defendant intends to rely on . . . [g]eneral [p]rinciples of [j]ustification," including self-defense pursuant to N.J.S.A. 2C:3-4.

tactical decisions and possibly prejudicing defendant's chance of acquittal." State v. Perry, 124 N.J. 128, 162 (1991). Here, as in Perry, "in the face of non-compatible defense strategy, we cannot conclude that the trial court committed plain error in not charging self-defense sua sponte." Ibid.

In Point Five, defendant argues that the judge's "denial of [his] new trial motion should be reversed." Relying on "contradictions" in some of the testimony, defendant asserts that the "jury verdict was against the weight of the evidence." We disagree.

Rule 3:20-1 provides:

> The trial judge shall not . . . set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law.

So long as a "trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present" based on the evidence in the record, a miscarriage of justice has not occurred and a defendant's motion for a new trial should be denied. State v. Smith, 262 N.J. Super. 487, 512 (App. Div. 1993) (quoting State v. Carter, 91 N.J. 86, 96 (1982)).

"The trial court's ruling on . . . a motion [for a new trial] shall not be reversed unless it clearly appears that there was a miscarriage of justice under

the law." <u>R.</u> 2:10-1.  Moreover, "[w]here the jury's verdict was grounded on its assessment of witness credibility, a reviewing court may not intercede, absent clear evidence on the face of the record that the jury was mistaken or prejudiced." <u>Smith</u>, 262 N.J. Super. at 512.  Indeed, we "may not overturn the verdict 'merely because [we] might have found otherwise upon the same evidence.'" <u>Ibid.</u> (quoting <u>State v. Johnson</u>, 203 N.J. Super. 127, 134 (App. Div. 1985)).  "Appellate intervention is warranted only to correct an 'injustice resulting from a plain and obvious failure of the jury to perform its function.'" <u>Ibid.</u> (quoting <u>Johnson</u>, 203 N.J. Super. at 134).

In denying defendant's motion for a new trial, the judge explained:

> I find that the jury was not a jury that did not consider the possible contradiction in some of the testimony.
>
> Clearly, in any trial, particularly in a case where there . . . were a lot of people[,] . . . there were a lot of different views . . . expressed as to exactly what happened, but I think the jury was able to consider any possible contradictions in the testimony, weigh those contradictions and find a verdict that was, in fact, not against the weight of the evidence. . . .  They were able to assess the demeanor of the witnesses and determine their credibility, and I find that they had every right to come to the verdict that they did.
>
> I also compliment [defense counsel] on his summation because he brought all of those things to the jury and discussed them with the jury and allowed them to consider, from a defendant's standpoint, in a very

32

> professional and competent way.  And I think that that also indicates . . . that the jury was able to consider . . . both the defense's . . . perspective . . . and the State's perspective and came out with a fair and just verdict in this case . . . .

We discern no miscarriage of justice to warrant setting aside the verdict for the reasons cogently articulated by the judge.  The jury had a rational basis to find the essential elements of the crimes charged beyond a reasonable doubt based on the evidence presented at trial, and we reject defendant's arguments to the contrary.

Finally, in Point Six, defendant challenges his sentence, arguing the judge erred in not finding mitigating factor five, N.J.S.A. 2C:44-1(b)(5), based on "one, or both, victims facilitat[ing] the commission of the crimes" by "act[ing] as the aggressors."  We disagree.

"Appellate review of the length of a sentence is limited."  State v. Miller, 205 N.J. 109, 127 (2011).  We will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

At sentencing, based on defendant's prior criminal history, substance abuse issues, the nature of the charges, and the injuries inflicted on the victims, the judge found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) ("risk that . . . defendant will commit another offense"), and nine, N.J.S.A. 2C:44-1(a)(9) ("need for deterring . . . defendant and others from violating the law").  Because defendant had "four children," the judge found mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11) ("imprisonment of . . . defendant would entail excessive hardship to [defendant] or his dependents").

Despite defense counsel's assertion that defendant suffered from "several maladies," including "narcolepsy," "[a]ttention [d]eficit [d]isorder," and "a heart attack" sustained shortly before the trial began, the judge expressly rejected defendant's arguments regarding the applicability of mitigating factors three, N.J.S.A. 2C:44-1(b)(3) ("defendant acted under a strong provocation"); four, N.J.S.A. 2C:44-1(b)(4) ("[t]here were substantial grounds tending to excuse or justify . . . defendant's conduct, though failing to establish a defense"); six, N.J.S.A. 2C:44-1(b)(6) ("defendant has compensated or will compensate the victim of his conduct for the damage or injury that he sustained"); or eight,

N.J.S.A. 2C:44-1(b)(8) ("defendant's conduct was the result of circumstances unlikely to recur"). Based on the weighing of the factors, the judge determined "the aggravating factors . . . totally outweigh[ed]" the sole mitigating factor.

Applying our deferential standard of review, contrary to defendant's contention, we are satisfied that the judge's findings regarding aggravating and mitigating factors are amply supported by the record, that the sentence imposed was in accordance with guidelines enunciated in the Code of Criminal Justice, and that the aggregate sentence is not manifestly excessive or unduly punitive, and does not constitute an abuse of discretion or shock our judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0313-18T1