**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0840-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DENNIS K. PARRISH,

    Defendant-Appellant.

_____

Submitted December 17, 2024 – Decided April 10, 2025

Before Judges Gilson, Bishop-Thompson and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 18-11-1015.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Molly O'Donnell Meng, Designated Counsel, on the brief).

Jennifer Webb-McRae, Cumberland County Prosecutor, attorney for respondent (Kimberly P. Will, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

On the morning of July 2, 2018, J.T.,[1] a passerby, observed a pile of smoldering debris while traveling on a dirt road in Cumberland County. He stopped to investigate and saw various human body parts in the pile of debris. J.T. notified the police of his observations. The victim was later identified as T.C.

A jury convicted defendant Dennis K. Parrish of first-degree purposeful or knowing murder of T.C., N.J.S.A. 2C:11-3(a)(1) and (2); two counts of second-degree desecrating human remains, N.J.S.A. 2C:22-1(a)(1) and (2); third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3(b)(1); fourth-degree obstructing administration of law or other governmental function, N.J.S.A. 2C:29-1(a); and fourth-degree tampering with or fabricating physical evidence, N.J.S.A. 2C:28-6(1). Defendant was sentenced to life imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on the murder conviction, ten years imprisonment on the second-degree desecrating human remains conviction consecutive to the murder conviction, and ten years

---

[1] We use initials and fictitious names for the victim and witnesses to protect their privacy interests.

A-0840-22

imprisonment on the second-degree desecrating concurrent to the murder and desecration convictions. The remaining counts were merged.

Defendant appeals his convictions and sentence. He argues that various trial errors occurred, depriving him of a fair trial, including: (1) admission of unreliable expert testimony concerning cell tower data; (2) admission of more than forty crime-scene and autopsy photos; (3) permitting the prosecutor's comments in summation, which amounted to misconduct; (4) admission of improper lay opinion testimony during the police witness's testimony narrating surveillance videos; and (5) the failure to instruct the jury on flight. In challenging his sentence, defendant argues the sentencing court erred in finding aggravating factor one, which resulted in double-counting of the elements of the offenses.

Having reviewed the record and governing laws, we are satisfied that none of the trial errors deprived defendant of a fair trial, and the sentencing court did not abuse its discretion in sentencing defendant. Thus, we affirm defendant's convictions and sentence.

## I.

We summarize the facts from the evidence presented at trial. We have also reviewed the sentencing record. Defendant's convictions arose from the

A-0840-22

murder and desecration of T.C., who had been at defendant's home in Vineland sometime between June 24 and June 30, 2018. Although defendant did not testify at trial, through counsel, he admitted that he dismembered, decapitated, and disposed of T.C.'s body. Defendant denied, however, that he murdered T.C. He claimed that T.C. had been killed by a third party.

T.C.'s desecrated body was discovered on the morning of July 2, 2018, by a passerby, J.T., while he was traveling on Banks Road, a dirt road that runs between Cedarville Road and Lummistown Road, in Cedarville. The police responded and commenced an investigation.

Lieutenant Ronald Keller of the New Jersey State Police (NJSP) responded to the scene that morning. Keller testified that the victim's body "was dismembered, decomposing, and burned," meaning that "the limbs were cut off, the head was cut off, and [the body] was in various areas." He further testified that "the victim's head was in a black trash bag that was partially burnt." Keller identified two photographs depicting the victim's remains as observed that day. On cross-examination, Keller identified several photographs from the autopsy depicting the victim's hands, including her palms and fingers. Keller testified that the victim was ultimately identified through fingerprints as T.C.

4

A-0840-22

In addition to other evidence collected at the scene, Keller found a "section of cardboard with [the] black plastic trash bag that was burned and melted." Affixed to this piece of cardboard was a sticker marked "ALLIED" in bold print along with the number S41882. This sticker on the cardboard was found underneath T.C.'s remains.

NJSP Detective Sergeant Adam Capoferri testified that he requested records from Allied, a transportation and storage company. The records associated with the lot and piece number found on the cardboard box amongst T.C.'s remains showed that defendant was the customer associated with this number.

NJSP Detective Sergeant Daniel Shalikar testified that T.C.'s phone was active and located in a Pontiac parked in a Walmart parking lot in the early morning hours of July 3, 2018. The car was occupied by two individuals, R.M. and N.S. The Pontiac was impounded.

Shalikar conducted a search of T.C.'s phone found in the Pontiac. No incoming or outgoing phone calls were detected before June 27, 2018. There were also no text messages detected before June 25, 2018. Shalikar explained that the lack of data before this date can be consistent with "a factory reset after transfer." Law enforcement later learned that R.M. and N.S. had purchased the

phone from T.C., and as of June 24, 2018, the phone was no longer in T.C.'s possession.

Detective Andrew Silipino testified regarding the search of the Pontiac, which yielded a kitchen knife, razor knife, pry bar, Louisville Slugger bat, box cutters, scalpels, trash bags, and other cell phones and charging cords. Silipino did not see any biological fluid, such as blood, on any of these items.

Silipino testified regarding his search of defendant's house on July 11 and July 12, 2018. Upon entering the home, Silipino testified there was a strong smell of cleaning product, like bleach, or a "chlorine stench," and that the third glass pane near the front door was missing. Defendant's landlord testified that this pane was not broken at the start of defendant's lease on February 1, 2018.

Additionally, Silipino testified to the tangible items located and collected inside defendant's home, including: a silver metal hatchet containing suspected blood; a hand truck; two cardboard boxes, one with the orange label Allied 304 lot number S41882, one with defendant's name on it; a roll of black plastic trash bags and one plastic bag with a blue tie; charcoal fluid; adhesive bandages and a cotton swab with stains on both; wooden kitchen matches; and receipts from Walmart dated June 28, 2018, Home Depot dated July 1, 2018, and Wawa dated July 2, 2018.

A-0840-22

Silipino testified to observing different blood spatter patterns in different locations throughout defendant's home; for instance, in the kitchen, dining room and living room. According to Silipino, blood stains were located in various places going into the basement, including the basement door handle, the steps leading to the basement, and the basement floor. Silipino collected samples from the various locations and submitted them for testing.

Rupal Frank-Slotwinski, an expert in forensic serology, testified that many of the swabs collected in defendant's home tested presumptively positive for blood, including swabs from the kitchen cabinet, wall and wall plug, the dining room table, bathtub drain, shower wall, and a bandage from the bathroom trash can. Other items, such as the hatchet, hand truck, and basement freezer, tested presumptively positive for blood as well. These items warranted further investigation and were sent out for DNA testing. A sample from T.C.'s mouth tested presumptively positive for semen.

Christopher Szymkowiak, a forensic scientist in the NJSP Office of Forensic Sciences, testified as an expert in DNA analysis. Szymkowiak analyzed various samples, including those taken from defendant's home and T.C.'s remains. He explained that he first looks for the number of contributors to a particular DNA profile and then determines its suitability for comparison.

In other words, he determines the number of people who contributed DNA to the sample and then determines, if possible, who those individuals may be.

Szymkowiak testified that a swab of suspected blood from the kitchen wall contained T.C.'s DNA. He stated that the blood from the kitchen cabinet was "consistent with at least two contributors," and defendant was "identified as a source of the major DNA profile." Profiles from T.C., R.M., and N.S. were excluded.

Blood from the basement handrail also showed "that there w[ere] two individuals present" and that defendant "was the source of the major profile" and T.C. matched the minor profile. R.M. and N.S. were "excluded" from the major and minor profile of blood from the basement handrail.

Szymkowiak testified that the swab from defendant's freezer contained a mixed profile, with T.C. as the major contributor and an unidentified minor contributor. He further explained that the clippings from T.C.'s left hand contained a multi-source profile, with T.C. as the major contributor and defendant as the minor contributor.

After the search of defendant's home was completed, Silipino went to the Luxury Inn and Suites in Absecon, where defendant was staying. In defendant's room, Silipino collected the following items: a laptop, a notebook, a Camillus

A-0840-22

knife, a Targus backpack, a duffle bag with clothes and other items, a garment bag, and one shirt. None of these items appeared to have blood on them.

T.C. resided with her mother, F.C. F.C. testified that she last saw T.C. on June 23, 2018. F.C. testified that she attempted to call T.C. several times but was unable to reach her.

Defendant's adult daughter, A.P., testified that she visited defendant with her children the weekend of June 22, 2018, through June 24, 2018, for a family party. A.P. stated that she was at defendant's house each day that weekend, and there did not appear to be anyone other than defendant living in the house. A.P. said that she did not see "any signs of foul play" during her visit and that defendant did not have any injuries on his hands. Nor did A.P. see any blood in the house or "smell anything unusual."

During law enforcement's investigation, several of defendant's neighbors witnessed various events surrounding defendant's house. Pam[2] lived with her husband Paul across the street from defendant. Pam testified that she "saw a white pickup truck" in defendant's driveway and a man "winching something . . . out of the house." She stated: "you could tell there was a chain or a rope,

___

[2] We refer to defendant's neighbors by fictitious first names to protect their privacy and intend no disrespect.

 A-0840-22

something like that," and the man was using it to get "something coming out of the door . . . ." She told her husband Paul what she saw.

Paul also testified that around June 30, 2018, his wife called him out to the deck, and he too saw "a white truck" in defendant's driveway. Paul confirmed that the man outside was defendant, and he also saw defendant "winching something," leading him to ask defendant if he needed some help. Defendant replied, "No [Paul], I am fine."

Around June 30, 2018, Bob, another of defendant's neighbors, saw a "white" pickup truck in defendant's garage, which he thought was "unusual." Bob stated the truck was from "a rental company . . . ." He saw that "[t]he gentleman driving [the truck] was jockeying it around at different angles, like he wanted to load it with something." He testified that "he would pull it out, change the angle, back it in, pull it out, change the angle, back it in. And I don't think it lasted ten minutes, the next thing I know, he left." Later that night, Bob got up during the night as he does each night and "check[ed] the perimeter" of his property. When he did so, he "saw lights belonging to a vehicle," and he "walked to the window and . . . saw this pickup leaving the driveway" of defendant's house.

A-0840-22

Defendant was arrested on July 12, 2018. NJSP Detective Michael Savnik testified that he located defendant at "The Luxury Inn and Suites" in Absecon, which is in proximity to the Atlantic City Airport. Savnik testified that defendant arrived at the hotel in a taxi. According to Savnik, defendant had two bags with him. Savnik stated that he ordered defendant to drop his bags and get on the ground "[m]ultiple times" but defendant did not comply, leading Savnik to take defendant into custody by "tackl[ing] him."

Savnik stated that he observed injuries to defendant's hands, elaborating that "[t]hey were bandaged" and that those injuries "were present before [he] tackled him to the ground." According to Savnik, without being asked any questions, defendant volunteered that he had gotten the injuries as a result of "a motorcycle accident." NJSP Detective Regina Potter assisted in processing defendant, and she also observed injuries to defendant's hands.

Following defendant's arrest, NJSP Detective Richard Echevarria searched defendant's belongings and found receipts from Home Depot and Lowe's. The Home Depot receipt for June 30, 2018, showed that defendant purchased "a 150 pound metal folding hand truck," which was returned on July 1, 2018, and bought a 1,000 pound hand truck on the same day. Defendant also purchased a "48[-]inch standard bungee cord" at Home Depot. The Lowe's

A-0840-22

receipts reflected a purchase of two six-foot nylon webbings on July 1, 2018, and various other items on July 3, 2018.

On July 3, 2018, Dr. Peter Mazari, who testified as an expert in forensic pathology, completed T.C.'s autopsy. An initial examination of the body showed "that the body had been dismembered and separated into multiple pieces" and that the plastic bags containing those pieces "had melted in places and some of the exposed surfaces of the body exhibited evidence of burning and charring" and "thermal damage." Dr. Mazari also stated he "could see that there was evidence of decomposition that had also taken place." He testified that there were "fractures . . . right over the eye socket."

Dr. Mazari determined the cause of death was "homicidal violence, including blunt force head injuries," and the "manner of death . . . homicide." He stated "[b]lunt force trauma can be from a variety of different sources" including "anything from a flat surface like the floor or a wall to something like a baseball bat even." Dr. Mazari was unable to opine as to the number of impacts to the victim's face due to the condition of the remains. However, he testified there could have been "a single blow" or "multiple distinct blows."

Dr. Mazari was also unable to determine the precise date and time of T.C.'s death because "the decomposition had gotten past those early stages and because

12

th[e] body had also been exposed to heat and has extensive thermal damage," and therefore, "a lot of those findings had been obscured." He could "tell that because the decomposition was there it had been . . . more than a day or so, but just how long is really obscured . . . ." Dr. Mazari opined that T.C.'s death occurred "at a bare minimum [thirty-six] hours" before her body was found on July 2, 2018, but stated that it could have been "much longer."

Without speculating and because of the number of variables, Dr. Mazari could not "conceive of a possible limit of time" when asked on cross-examination as to the outside range of time T.C. may have died. When pressed, Dr. Mazari stated that if the body had been put in a freezer, "it could've been stored for much, much longer," but without freezing the body, Dr. Mazari concluded T.C. may have died "a week or maybe a little bit longer" before her body was found.

Dr. Mazari also testified that a toxicology analysis conducted on T.C.'s body revealed "[e]thanol" and "[c]ocaine" along with "its metabolite, [b]enzoylecgonine," which indicates "cocaine was present in the past."

Dr. Mazari testified during both direct and cross as to several photographs that were published to the jury, including "a photograph of [T.C.'s] head still inside of the plastic bag" with the plastic bag melted onto T.C.'s face, as well as

13

a close-up of that photo.  He also testified as to a photo that showed T.C.'s head and face with "fly eggs . . . that have been deposited in the hair" which showed "decomposition."  Dr. Mazari explained that some of the photos depicted how the body was dismembered with both arms removed "just past the shoulders" and the legs removed "at the knee joints . . . ."  More photos showed how T.C.'s hands had been "cut at the wrists," and others depicted how plastic bags had melted onto various parts of the body.

During his testimony, Dr. Mazari reviewed photos of the location of T.C.'s body when it was discovered on July 2, 2018, and opined on the specifics of how the body was dismembered, burned, and had begun to decompose.  His autopsy revealed hairs on T.C.'s hands and wrists.

Dr. Mazari consulted with Evan Bird, a forensic anthropologist, to complete a "trauma analysis on portions of [T.C.'s] remains."  As Mazari explained, anthropologists are experts in bones, and specifically, in "boney trauma."  Mazari further explained that "in certain cases where we don't have a good example of soft tissue injury, which is the most reliable source of injury . . . we need to focus on bone injuries[, and] we'll rely on the anthropologist."

Bird, admitted as an expert in forensic anthropology without objection, testified he found a fracture "of the superior right orbit," which is the part of the

14

face that the "eyeball is in." He determined it "appear[ed] to be due to blunt or sharp force trauma" "that would've happened at or around the time of death;" however, he was unable to opine as to whether the instrument was sharp or blunt. Bird also testified T.C. had fractures in her nasal bones that he believed had occurred at or around the time of death.

With no objection, Bird testified regarding several photos that showed how T.C.'s body was dismembered and then burned. Bird concluded the burning occurred after dismemberment and that the dismemberment was done "more of in a sawing manner than a hacking manner."

Melissa Balogh testified as an expert in the field of hair identification, comparison, and fiber analysis. She testified regarding the analysis she performed on the hair samples found during the autopsy on T.C.'s hands and wrists and at the scene. Balogh explained that hair samples come generally from three categories: Caucasian, African American, or Asian. Balogh agreed that a "mixed race" type generally is often associated with someone of Hispanic origin.

Balogh testified the hair found on T.C.'s right wrist was "a color treated reddish brown head hair that is physically and microscopically dissimilar to the known hair sample from the victim and [cannot] be associated with [T.C.]" Balogh found the hair on T.C.'s right wrist was "associated with Caucasian or

mixed[-]race head hairs." Balogh concluded hairs found on T.C.'s left hand "were identified as color-treated reddish brown head hair fragments that are physically and microscopically dissimilar to the known hair sample from the victim and [cannot] be associated with [T.C.]."

Later, in October 2018, Balogh compared the hair samples from the victim with hair samples from defendant. She testified regarding her findings that "[t]he pulled head hairs from [defendant] are physically and microscopically dissimilar to the previously examined hairs." Balogh testified that none of the hair samples analyzed came from either T.C. or defendant.

However, on redirect, Balogh testified that the pubic hair located on the basement floor of defendant's residence had racial characteristics of African American origin. According to Balogh, the racial characteristic of T.C.'s hair sample was African American.

NJSP Detective John Weber was assigned to assist in the investigation. He testified regarding the various tasks assigned to him, including examining the results of the phone extractions completed on defendant's and T.C.'s phones. Weber testified that he also examined information extracted from the phone of defendant's cousin through marriage, J.P., who had been identified as a close

acquaintance of T.C. J.P. had also been excluded from the blood sample analysis done on the basement handrail.

Weber discovered that, at 1:47 a.m. on June 24, 2018, J.P. messaged T.C. via Facebook messenger about getting together. When T.C. responded that she was in Millville, J.P. replied he was "not coming out there" because he had "[n]o gas." However, at 2:09 a.m., J.P. messaged T.C. that he was on his way and that he wanted to have sex, to which T.C. replied, "okay."

There were several calls between defendant and J.P. beginning at 11:30 p.m. on June 23, 2018, and continuing into the early morning hours of June 24, 2018. On June 24, 2018, J.P. and defendant communicated at 3:32 a.m. and then again at 6:06 a.m. and 7:41 a.m. Weber testified that during this time, there were no calls or texts between J.P. and T.C.

NJSP Detective Sergeant Brian Kearns testified as an expert in cell site analysis and cellular technology. Kearns explained that historical cell site analysis provides "a list of all the incoming and outgoing calls" and "we will take a look at those calls and . . . see either patterns of contacts, or patterns of locations, or where a device is in a general vicinity at a given time, or whether or not there was interaction between two different devices." Kearns stated that a cell phone generally connects with a cell tower with the "strongest, closest

17

signal." He acknowledged that there could be "anomalies" such as "physical barriers" or the "cell site could be very busy," affecting the connection.

Kearns explained that he uses GeoTime software to perform the analysis. Kearns testified that the GeoTime software used for the cell site analysis uses "a generally accepted radius that's nationally accepted by the FBI" of "1.5 miles" for the range of how far out the cell site can reach from a particular tower. He stated the software "will indicate . . . likely where the device was, because that's where [it's] receiving the strongest signal from." Based upon the data entered, GeoTime creates a map showing a cell phone's location within that radius. Kearns testified that "no one can speak to the exact range, dependent upon the technology at the time, the weather conditions, the barriers, strength of the device, how far out that signal will reach as far as the strongest signal."

Kearns next explained the analysis he conducted using GeoTime of the cellphone records and data extractions from defendant's, J.P.'s and T.C.'s cell phones. According to Kearns, J.P. and defendant had communications in the late evening of June 23, 2018. Kearns testified that in the early morning of June 24, 2018, J.P.'s and T.C.'s devices appeared to be in the same vicinity in Millville, and then both devices began moving "northbound" towards the area of defendant's residence. By 3:35 a.m. that same day, J.P.'s, T.C.'s, and

18

defendant's devices were all within range of cell towers that service defendant's residence. In Kearns' opinion, by 5:10 a.m. on June 24, 2018, "all three devices have separated." He further explained that between 5:10 a.m. and 12:16 p.m. on June 24, 2018, T.C.'s device was "not likely" in the vicinity of defendant's residence. In the following days, J.P.'s phone was in Bridgeton, Vineland, and Millville.

Regarding defendant's device, Kearns testified that "there was no location activity recorded" between June 24, 2018, and June 28, 2018, which was "indicative of both the device and the SIM card changing, which typically [occurs] when an individual gets a new . . . [cell phone]." Kearns opined that the inability to reach defendant's device during this time was more indicative of the phone being "[d]amaged" or the "SIM card [being] removed" rather than the phone being turned off.

NJSP Detective Rigoberto Onofre reviewed surveillance footage from several locations relevant to the investigation and created a timeline for the surveillance footage collected. Before testifying, the court held a Rule 104 hearing[3] and limited Onofre's narration testimony during some of the video

---

[3] A "104 hearing" is a hearing pursuant to N.J.R.E. 104 to address "preliminary evidence questions that are the exclusive province of the court," outside the

surveillance footage. During Onofre's testimony, the surveillance videos for each location along the path were played for the jury in conjunction with his testimony.[4]

Onofre testified that he personally collected surveillance footage from a Walmart in Vineland from June 28, 2018. Onofre testified that the Walmart video showed an individual purchasing items, including ginger ale, luggage, and scar gel around 5:00 p.m. A receipt for those items was found in defendant's house.

Onofre was questioned extensively regarding his observations of defendant's hands and whether he observed any injuries. According to Onofre, the Walmart surveillance video showed the individual in the video had what "appear[ed] to be a white bandage" on his right hand, specifically, his right ring finger. Onofre testified that he saw the white bandage again in the U-Haul footage recorded two days later on June 30, 2018. On redirect, Onofre testified that he observed defendant "from a distance" at the police station while he was

---

presence of the jury, which may include witness qualifications, admissibility of evidence, such as the statements of a defendant in a criminal trial. Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 104 (2025).

[4] None of these videos are included in the appellate record.

being processed following his arrest.  Onofre stated that defendant's right hand was bandaged.  He also testified that during the search of defendant's residence, "a lot of bandages" with "what appear[ed] to be some blood" on them were found, and many were also located in a trash bin.

Onofre reviewed the U-Haul footage "regarding a truck that was rented by a subject identified as [defendant]."  According to Onofre, he was able to determine that defendant rented "a white GMC Sierra pickup vehicle with the U-Haul logo on . . . [the] driver's side and passenger-side doors" on June 30, 2018, around 12:37 p.m.  In this footage, Onofre testified that he "did not" observe any "external injuries" on the individual's head.

Onofre testified that he reviewed additional surveillance footage from the Home Depot location in Vineland from July 1, 2018, which was the same store location as listed on the receipts recovered from defendant's belongings.  Onofre testified that this footage showed an individual purchasing the larger hand truck and bungee cord.  Onofre obtained surveillance footage from the Home Depot later on the same day, which showed an individual purchasing "[a] wire rope with [a] grab hook."

Onofre testified that he and other investigators collected surveillance footage from businesses during the early hours of July 2, 2018, showing the

21

white U-Haul truck defendant rented in various locations along the suspected path of travel from defendant's home to where T.C.'s body was discovered.

The first place the white truck was seen on surveillance was "First Choice Freezer" in Vineland on July 2, 2018, at 12:35 a.m. The next time Onofre observed the truck was "through the Vineland Police Department's Street cameras" at 12:48 a.m. He confirmed that he observed on that footage something "in the back of the suspect vehicle consistent with a cardboard box." Onofre detailed that the Vineland Police Department's automated license reader tagged the white truck and showed the license plate number was SAH95130, which Onofre confirmed was the same license plate number as that on the "registration for the vehicle that [] defendant rented from the U-Haul previously on June 30th."

Onofre next saw the truck "on surveillance at Joe's Poultry" at 12:48 a.m. "going south on Delsea Drive and heading towards the location of where the body was eventually found." The truck then continued south "towards the location where the body was found" and was picked up on surveillance footage from LaTorre Hardware and a Nissan Dealership at 12:50 a.m. At 1:15 a.m., Onofre testified that surveillance footage from My Neighborhood Deli captured

22

the truck at the intersection of Cedarville Road and Buckshutem Road, which is in "[v]ery close" proximity to where T.C.'s body was found.

The surveillance footage from My Neighborhood Deli also showed the truck coming back "[a]t approximately 1:36 a.m." Onofre testified that the truck was then seen on surveillance from Wawa in Millville at "[a]pproximately 1:48 a.m.," which correlated with a Wawa receipt recovered from defendant's house, revealing a sandwich purchase on July 2, 2018, at 1:51 a.m. Onofre also testified as to the surveillance footage from the Wawa, showing the white truck outside of the Wawa and an individual entering the Wawa and making a purchase in the store. Onofre testified that the individual's head in the video was exposed, and he did not observe any external injuries to the individual's head. Onofre testified that as the truck drove away, "[t]here was nothing in the bed of the pickup truck, of the suspect vehicle" depicted in the footage.

At 2:05 a.m. that morning, the Vineland Police Department's surveillance footage captured the white truck driving "[t]owards [defendant's] residence," and at 2:06 a.m., the footage captured the truck at Southwest Council, which is in close proximity to defendant's house. Onofre testified that surveillance footage from U-Haul on July 3, 2018, at 1:00 p.m. showed the white truck being returned to the same location from which it had been rented.

23

The defense called one witness: Dr. Alexander Fishman, the emergency room physician who examined defendant following his arrest on July 12, 2018. Dr. Fishman testified defendant had "cuts" "on both hands" and "[t]he ones on his right hand were deeper" than the left. He stated the cuts on defendant's hands "looked relatively deep and they looked like they were already starting to heal by a scarring . . . ." He thought the cuts "certainly look[ed] old and again in relative term . . . certainly greater than [twenty-four] hours." Defendant also had cuts on his fingers. Dr. Fishman also observed defendant had "a moderate contusion" on the left side of his head. He confirmed that defendant has "[d]arker" skin so the bruising may not be outwardly observable on pictures or videos. Dr. Fishman ordered a CAT scan for defendant. The results showed "no hemorrhage or other . . . cranial abnormalities."

Defendant elected not to testify. His theory was that he was burglarized by T.C. and other unidentified individuals after T.C. had been to his house days earlier. Defendant argued these individuals broke into his home, as evidenced by the missing pane on the front door, attacked him, and knocked him unconscious. Defendant theorized that one of the other individuals murdered T.C. and dragged her body to the basement, which he later discovered upon

24

regaining consciousness.  Upon finding T.C.'s body, defendant acknowledged dismembering and disposing of T.C.'s body.

On August 1, 2022, the jury convicted defendant of all counts.  On the murder conviction, defendant was sentenced to life in prison, subject to NERA.  On count two, second-degree desecrating human remains, defendant was sentenced to ten years imprisonment to run consecutive to the life sentence.  For count three, second-degree desecrating human remains, defendant was sentenced to ten years imprisonment to run concurrent to the sentences imposed on counts one and two.  The remaining convictions were merged.

## II.

Defendant, represented by counsel, raises the following issues for our consideration:

POINT I

THE STATE ELICITED UNRELIABLE EXPERT TESTIMONY ON CELL TOWER DATA OVER DEFENSE OBJECTION, REQUIRING REVERSAL.

POINT II

THE TRIAL COURT ERRED IN ADMITTING MORE THAN FORTY CRIME SCENE AND AUTOPSY PHOTOS OVER DEFENSE OBJECTION, REQUIRING REVERSAL.

A-0840-22

POINT III

THE PROSECUTOR ENGAGED IN MISCONDUCT REQUIRING REVERSAL WHEN, IN SUMMATION, SHE REPEATEDLY DENIGRATED THE DEFENSE AND DEFENDANT'S CONSTITUTIONAL RIGHT TO DISCOVERY.

POINT IV

THE CUMULATIVE EFFECT OF THE AFOREMENTIONED ERRORS DENIED DEFENDANT A FAIR TRIAL.

POINT V

A REMAND FOR RESENTENCING IS REQUIRED BECAUSE THE COURT IMPROPERLY FOUND AGGRAVATING FACTOR ONE BY DOUBLE-COUNTING ELEMENTS OF THE OFFENSES.

Defendant filed a pro se supplemental brief raising two arguments, which he articulated as follows:

POINT I

THE TRIAL COURT ERRED BY ALLOWING A POLICE WITNESS TO RENDER IMPROPER LAY WITNESS OPINION TESTIMONY, NARRATING SURVEILLANCE VIDEOS PRIOR TO AND AS THEY WERE SHOWN TO THE JURY, COMMENTING ON SCREEN SHOT PHOTOGRAPHS OF THOSE VIDEOS, WHICH INVADED THE PROVINCE OF THE JURY TO DECIDE FACTS IN DISPUTE.

26

POINT II

BECAUSE THERE WAS NO DIRECT OR CIRCUMSTANTIAL EVIDENCE THAT THE DEFENDANT HAD THE REQUISITE KNOWLEDGE THAT HE WAS TO BE ACCUSED OF A CRIME PRIOR TO HIS DEPARTURE, INSTRUCTING THE JURY ON FLIGHT AND THE WEIGHT TO BE GIVE[N] SUCH EVIDENCE CONSTITUTED PLAIN ERROR.

We review the trial court's evidentiary rulings with deference. State v. Garcia, 245 N.J. 412, 430 (2021). An abuse of discretion is found only when the court has made a "clear error in judgment." State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)). The court's evidentiary decision should be sustained unless it resulted in a "manifest denial of justice." State v. Perry, 225 N.J. 222, 233 (2016) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

A.  Expert Testimony Regarding Cell Phone Data.

Defendant contends the trial court erred in admitting the unreliable expert testimony of Kearns on cell tower data. Specifically, he argues "Kearns' methodology was scientifically unreliable because he had no personal knowledge of the coverage area of the cell towers" in this case and relied on the FBI's 1.5-mile radius "without any knowledge, data, personal experience, or training to support that radius," thus resulting in a net opinion.

27

We defer to a trial court's evidentiary ruling that a witness is qualified to present expert testimony pursuant to N.J.R.E. 702 and review for abuse of discretion. State v. Garcia, 245 N.J. at 430. Such a determination "will only be reversed for manifest error and injustice." State v. Rosales, 202 N.J. 549, 562-63 (2010) (quoting State v. Jenewicz, 193 N.J. 440, 455 (2008)).

N.J.R.E. 702 and N.J.R.E. 703 govern the admissibility of expert testimony. Townsend v. Pierre, 221 N.J. 36, 53 (2015).

> Expert testimony must be offered by one who is "qualified as an expert by knowledge, skill, experience, training, or education" to offer a "scientific, technical or . . . specialized" opinion that will assist the trier of fact, see N.J.R.E. 702, and the opinion must be based on facts or data of the type identified by and found acceptable under N.J.R.E. 703.
>
> [Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011).]

The party offering the expert testimony bears the burden of establishing its admissibility. State v. Harvey, 151 N.J. 117, 167 (1997) (citing Windmere, Inc. v. Int'l Ins. Co., 105 N.J. 373, 378 (1987)). "[A] court must ensure that the proffered expert does not offer a mere net opinion." Pomerantz, 207 N.J. at 372. The net opinion rule, a corollary of N.J.R.E. 703, "forbids the admission of evidence of an expert's conclusions that are not supported by factual evidence or other data." Townsend, 221 N.J. at 53-54 (quoting Polzo v. Cnty. of Essex,

A-0840-22

196 N.J. 569, 583 (2008)). "The rule requires that an expert 'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)).

Before trial, the court conducted a hearing on defendant's motion to bar expert testimony on cell tower data, challenging Kearns' qualifications as an expert and the reliability of his opinion. At the motion hearing, Kearns detailed his specialized training in the field of historical cell site analysis and cell phone technology. He also explained certifications he obtained in GeoTime software, which is "purely [a] visualization tool[]" that "ingests records from cellular providers or from mobile extractions and [] displays it in a more visual way than either a text file or spreadsheet."

Kearns testified he has used historical cell site analysis during his career. He also testified he has personally analyzed mapped cell phone data using GeoTime "at least [thirty]" times and, as a supervisor, he has reviewed other investigators' work on mapping and historical cell site analysis "[a]t least 200" times.

As to the range of the radius of the cell tower data used by the GeoTime software, Kearns testified that "[w]hen we map things in GeoTime we've been

provided or the software provider has been given a generally accepted standard that's accepted by the FBI of a 1.5 mile radius as being the strength of a typical cell site." While Kearns testified he can adjust the radius, he "typically do[es] not unless we're specifically told by the requesting agency that there's known to be a stronger or weaker cell site." He testified that the software gives a general area and "absolutely cannot pinpoint the exact location" of a phone. Kearns stated the cell site analysis is still reliable and accurate because "the phone will not work if the device is not connected to a cell site" "so if there's a successful call in the records, the cell site that that device was connected to is the one that will display in the records." He confirmed that he and other investigators "don't change or manipulate any of the data" involved in the cell site analysis.

The trial court denied defendant's motion to bar Kearns' testimony, finding the subject matter of cell tower analysis "beyond the ken of an average juror in and of itself," comporting with N.J.R.E. 702, and that Kearns had sufficient training and experience to qualify him as an expert in this field.

Defendant contends that the methodology used by Kearns was scientifically unreliable and that Kearns had no personal knowledge of, or sufficient expertise regarding, the 1.5-mile radius standard used by the FBI. Defendant relies on State v. Burney, 255 N.J. 1 (2023), for his assertion that

Kearns' reliance on the FBI's 1.5-mile radius resulted in an unreliable net opinion. In Burney, a special agent testified that cell towers in the area "had an approximate coverage range with a radius of about one mile" and "[t]hat estimated radius was based solely on [the special agent's] 'rule of thumb' for the area—a 'good approximation' based on his training and experience." Id. at 5. The special agent "relied on that approximation to place defendant's cell phone at or near the crime scene at the time of the robbery," of which defendant was accused of committing. Ibid.

The Court held the "'rule of thumb' testimony constitute[d] an improper net opinion because it was unsupported by any factual evidence or other data." Id. at 25. Significantly, the Court did not find analysis of historic cellphone tower data inherently unreliable, and expressly noted expert testimony need not necessarily "consider all of the factors" discussed in its summary of law and the agent's testimony. Ibid. Rather, "because the testimony was based on nothing more than . . . [the agent's'] personal experience, the trial court erred in allowing the jury to hear [the] testimony." Ibid.

The facts of Burney are distinguishable from this case. Unlike the special agent's testimony in Burney, Kearns testified both at the pre-trial hearing and at trial that the GeoTime software used a radius of one and a half miles which was

31

accepted and used by the FBI, demonstrating that the radius "is common practice" and had been used by other agents. Ibid. Further, Kearns accounted for "potential flaws" in the radius, explaining at the pre-trial hearing that the software gives a general area and "absolutely cannot pinpoint the exact location" of a phone. Moreover, "no one can speak to the exact range" of "how far out that signal will reach" based on a variety of factors, such as weather conditions, physical barriers, or strength of the device. Id. at 25.

Further, Burney maintains that courts have "accepted expert testimony about cell site analysis for the purpose of placing a cell phone within a 'general area' at a particular time." Id. at 21-22. Kearns' testimony was within the boundaries of Burney; he only testified about general areas where defendant's, J.P.'s, and T.C.'s phones were at various dates. Of importance, Kearns stated that early on June 24, 2018, J.P.'s and T.C.'s phones appeared to meet up in the same area and then both moved toward the area of defendant's house. He then testified J.P.'s, T.C.'s, and defendant's devices were all within range of towers that serviced defendant's house later that morning. As the trial court found, Kearns did not testify certain individuals' phones were at a particular address but only detailed the general areas where the phones were at a given time,

testimony that has been widely "accepted" as "expert testimony about cell site analysis." Id. at 21-22.

Moreover, defendant fails to explain how he was prejudiced by this testimony even if its admission was in error. Defendant contends that the cell tower data testimony was the only evidence that T.C. went to defendant's home on June 24, 2018, with J.P. However, at trial, defendant argued that T.C. "had been to his house a couple of days ago, scoped it out" and, based on that visit, came up with a plan to come back and burglarize defendant's house with others. And, when T.C. returned days later with other individuals, it was one of those other individuals who murdered her. Additionally, the State presented DNA evidence that T.C. had been at defendant's home.

Thus, we discern no error in the trial court's conclusion that the witness demonstrated sufficient expertise and training in the field of cell tower data analysis to qualify as an expert witness. The trial court also properly found that the cell tower analysis is generally accepted in the scientific community and is sufficiently reliable to be admitted into evidence to show the general location of a cell phone at a particular time.

A-0840-22

B. Admission of Crime Scene and Autopsy Photos.

Defendant contends the trial court erred in admitting over forty graphic crime scene and autopsy photos, particularly because defendant did not contest T.C.'s death or the desecration of her body. In response to the State's motion to admit crime scene and forensic anthropology photos, defendant argued against their admission on relevancy grounds and their probative value in comparison to their highly prejudicial impact.

As with other evidentiary determinations, "[i]t has long been the rule in this State that admissibility of photographs of the victim of a crime rests in the discretion of the trial court, and the exercise of its discretion will not be reversed in the absence of a palpable abuse thereof." State v. Thompson, 59 N.J. 396, 420 (1971). The photos in this case of the victim's dismembered body part were certainly "likely to cause some emotional stirring . . . . " Id. at 421. However, such photos only become inadmissible "when their probative value is so significantly outweighed by their inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue of guilt or innocence." Ibid.

Defendant relies on State v. Johnson, 120 N.J. 263, 298-99 (1990), and State v. Lockett, 249 N.J. Super. 428, 432-33 (App. Div. 1991), to support the

assertion that the trial court's admission of these gruesome photos deprived defendant of his right to a fair trial, requiring reversal. Although reversing on other grounds, the Court in Johnson addressed the admissibility of crime scene photos and blood-spatter slides admitted after the medical examiner had testified. 120 N.J. at 298. The Court reiterated that to be admissible, "photographs must be 'logically relevant' to an issue in the case." Id. at 297 (quoting State v. Bey, 112 N.J. 123, 182 (1998)).

In Lockett, we reversed defendant's convictions for first-degree aggravated manslaughter, in part, because the trial court improperly admitted inflammatory photos of the victim's body. 249 N.J. Super. at 431. We held that these photos bore no logical connection to the "essential question for the jury" which was "whether defendant's driving recklessly caused the death of the pedestrian" (lesser included offense of "third degree death by auto") "or whether his driving recklessly caused the pedestrian's death under circumstances manifesting extreme indifference to human life" ("first degree manslaughter"). Id. at 432.

Here, the judge properly conducted a pre-trial hearing, carefully reviewing each photograph, entertaining the arguments of counsel, and making an individualized admissibility determination as to each photo's relevance and

probative value as to the murder and desecration charges. Moreover, the State sought to admit approximately ninety-five photos, which the court did not permit. Rather, in only admitting forty photos, the court concluded that many of the photos were cumulative. The court also invited counsel to submit proposed limiting instructions regarding these explicit photos.

At trial, unlike Johnson, the photos were used during the testimony of the medical examiner and the forensic anthropologist to explain the cause and manner of T.C.'s death and the extent of desecration. Thus, their testimony and discussion of the photos were not "corroborative of other, essentially unchallenged testimony." Johnson, 120 N.J. at 298.

Defendant argues that the photos were only admitted to inflame the jury because he had admitted to the desecration counts. Defendant did not advise the court or prosecutor that he was not contesting the desecration charges, nor did he raise the issue during trial when the photos were admitted and published to the jury.

Desecrating human remains occurs when a person "[u]nlawfully disturbs, moves or conceals human remains" or "[u]nlawfully desecrates, damages or destroys human remains." N.J.S.A. 2C:22-1(a)(1), (2). While defendant told the jury in his opening statement he was "tak[ing] responsibility" for counts two

A-0840-22

through six involving the desecration and obstruction charges, it remained the State's burden to prove every charge beyond a reasonable doubt, including the desecration charges.

Thus, unlike Lockett, the photos of the dismembered and burned body parts depicted how the remains were "desecrate[d], damage[d] or destroy[ed]" and were probative as to the desecration charges. Further, photos may be introduced "to establish purpose or knowledge to support the murder charge" and "the fact that the photographs were gruesome in their revelations does not detract from the fact that they were legitimately a part of the State's proof of defendant's criminal state of mind." State v. Sanchez, 224 N.J. Super. 231, 250 (App. Div. 1988) (quoting State v. Micheliche, 220 N.J. Super. 532, 545 (App. Div. 1987)).

We discern no abuse of discretion in the judge's determination to admit the photos as relevant and probative of the charges against defendant and injuries sustained by T.C.

C. Prosecutorial Misconduct.

Defendant contends the prosecutor's comments during summation constituted misconduct, depriving him of a fair trial. Specifically, defendant argues that the prosecutor "accused the defense of lying," using the discovery

A-0840-22

process and delay in the case to craft a "story" designed to "trick" the jury, and referred to defendant as a "cold-blooded killer."

We recognize the "uniquely challenging" role a prosecutor plays in our criminal justice system. State v. Williams, 244 N.J. 592, 607 (2021) (quoting State v. McNeil-Thomas, 238 N.J. 256, 274 (2019)). A prosecutor is called "to represent vigorously the state's interest in law enforcement and at the same time help assure that the accused is treated fairly, and that justice is done." Ibid. (quoting McNeil-Thomas, 238 N.J. at 274).

In ensuring that "justice is done," a prosecutor must "refrain from improper methods calculated to produce a wrongful conviction" but the prosecutor can "use every legitimate means to bring about a just one." Ibid. (first quoting State v. Frost, 158 N.J. 76, 83 (1999); and then quoting State v. Smith, 212 N.J. 365, 403 (2012)) (internal quotation marks omitted). "Prosecutors therefore 'may strike hard blows, [but] not . . . foul ones.'" Ibid. (alterations in original) (quoting Smith, 212 N.J. at 403). In presenting closing arguments to the jury, a prosecutor is "expected to make vigorous and forceful closing arguments[,]" and in doing so, are "afforded considerable leeway." Ibid. (quoting Frost, 158 N.J. at 82).

Defendant did not object to the prosecutor's comments. Therefore, we review for plain error. R. 2:10-2; State v. Clark, 251 N.J. 266, 286-87 (2022). We review these comments to determine if they were "of such a nature as to have been clearly capable of producing an unjust result." Williams, 244 N.J. at 608 (quoting State v. R.B., 183 N.J. 308, 330 (2005)).

Defendant first points to the prosecutor's reference to him as "a cold-blooded killer." Our Supreme Court has cautioned prosecutors "that derogatory name-calling will not be condoned." State v. Williams, 113 N.J. 393, 456 (1988). Nonetheless, if "the prosecutor's labeling of defendant as a 'cold-blooded killer' was supported by the evidence and was made in response to defense counsel's argument, it does not constitute reversible error." State v. Morton, 155 N.J. 383, 457 (1998).

Here, in defense counsel's opening statement, he argued that T.C. and others burglarized his house and attacked him, and one of those individuals killed T.C. Counsel further argued that he disposed of T.C.'s body in a panic once he found her dead. Similarly, in closing, defense counsel argued that defendant disposed of T.C.'s remains out of panic and not premeditation. During the prosecutor's summation, she pointed to the evidence showing that defendant stopped at Wawa and bought a chicken sandwich after disposing of T.C.'s

39

remains. The prosecutor's statement that these actions demonstrated "the act[s] of a cold-blooded killer" were in direct response to the defense's theory of the case and the evidence presented at trial. Thus, in this context, we discern no misconduct warranting reversal. Morton, 155 N.J. at 457.

Defendant next contends the prosecutor's repeated references to the defense's "story" concocted during the discovery process and lengthy delay between arrest and trial was designed to "trick" the jury. The prosecutor commented that the "defense has had the last four years to look at the evidence and to gather that evidence and kind of squeeze and squish it all together and come up with the story that may be able to trick you."

Our courts have noted "[i]t is clearly improper for a prosecutor 'to demean the role of defense counsel or cast aspersions upon a lawyer's motives.'" State v. Setzer, 268 N.J. Super. 553, 565 (App. Div. 1993) (quoting State v. Darrian, 255 N.J. Super. 435, 457 (App. Div. 1992)). "It is likewise improper for a prosecutor, without support in the evidence, to accuse a defendant of conspiring with his counsel to conceal and distort the truth." Ibid. (quoting Darrian, 255 N.J. Super. at 457).

The prosector's characterization of the defense as a story alone was not improper. In fact, the defendant during his summation used this term as well.

The more problematic comment was the prosecutor's use of the term "trick," implying that defendant and his attorney used the years between arrest and trial to concoct a story aimed at deceiving the jury.  This comment "could reasonably imply a conspiracy between defendant and his counsel," id. at 566, "to conceal and distort the truth," id. at 565 (quoting Darrian, 255 N.J. Super. at 457).  This type of comment is not proper.

The question before us is whether this remark constitutes plain error.  For the following reasons, we are satisfied it does not.  First, the remark was made in isolation and not repeated.  Although defendant did not object at the time to this comment, the trial court later instructed the jury that comments made in summation "are not evidence and must not be treated as evidence."  In the context of this lengthy trial, we are satisfied that the improper comment did not deprive defendant of a fair trial.

D.  Narration Testimony.

In his pro se supplemental brief, defendant contends that the trial court erred in admitting lay opinion testimony regarding the surveillance videos. Defendant argues that Detective Onofre's narration testimony opining on whether defendant did or did not have injuries to his hands or head invaded the province of the jury because the testimony went to a material fact in dispute.

N.J.R.E. 701 governs lay opinion testimony:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it:
>
> (a) is rationally based on the witness' perception; and
>
> (b) will assist in understanding the witness' testimony or determining a fact in issue.

The Rule "does not permit a witness to offer a lay opinion on a matter 'not within the witness's direct ken . . . and as to which the jury is as competent as he [or she] to form a conclusion.'" State v. McLean, 205 N.J. 438, 459 (2011) (omission in original) (quoting Brindley v. Firemen's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)).

Our Supreme Court has provided guidance on the admission of lay witness narration testimony. State v. Watson, 254 N.J. 558 (2023). The Watson Court explained "that [N.J.R.E.] 701, 602, and 403 in tandem provide the proper framework to assess video narration evidence by a witness who did not observe events in real time." Id. at 600. The Court did not ban all narration testimony but stated "[a]n investigator who has carefully reviewed a video a sufficient number of times prior to trial can . . . satisfy [Rule 701's] 'perception' and 'personal knowledge' requirements as to what the video depicts." Id. at 601.

A-0840-22

The Court set forth four principals to guide the admission of narrative testimony concerning video evidence:

> First, neither the rules of evidence nor the case law contemplates continuous commentary during a video by an investigator whose knowledge is based only on viewing the recording. To avoid running commentary, counsel must ask focused questions designed to elicit specific, helpful responses. "What do you see?" as an introductory question misses the mark.
>
> Second, investigators can describe what appears on a recording but may not offer opinions about the content. In other words, they can present objective, factual comments, but not subjective interpretations. []
>
> Third, investigators may not offer their views on factual issues that are reasonably disputed. Those issues are for the jury to decide. [] So a witness cannot testify that a video shows a certain act when the opposing party reasonably contends that it does not.
>
> []Fourth, although lay witnesses generally may offer opinion testimony under [N.J.R.E.] 701 based on inferences, investigators should not comment on what is depicted in a video based on inferences or deductions, including any drawn from other evidence.
>
> [Id. at 603-04 (citations omitted).]

The Watson Court warned against an investigator stating "that's the defendant" while describing video evidence to a jury. Id. at 604.

To avoid the pitfall of continuous commentary, "counsel must ask focused questions designed to elicit specific, helpful responses." Id. at 603.

43                                                          A-0840-22

Additionally, "investigators can describe what appears on a recording but may not offer opinions about the content." Ibid. "In other words, they can present objective, factual comments," such as "[t]he 'individual opened the door with his elbow'" if not reasonably in dispute, but not "subjective interpretations" such as that "he did so 'to avoid leaving fingerprints.'" Ibid.

The court addressed the admissibility of Onofre's narration testimony of the Walmart and U-Haul videos in a Rule 104 hearing. Applying the legal principals and caveats set forth in Watson, we discern no abuse of discretion in the court's evidentiary rulings on the narrative testimony.

Regarding the June 28, 2018, Walmart video, the court permitted Onofre to testify that, after reviewing the footage, he observed on the "subject's right hand" what appeared to be "consistent with a bandage." Onofre was also shown a still photo from the surveillance footage. He confirmed that the photo fairly and accurately represented the "suspected bandage" he believed he saw on the subject's right hand. Onofre was also permitted to testify regarding the U-Haul footage from June 30, 2018. He testified that he did not see any "external injuries to the subject's head" in that footage. He testified that he observed the subject signing paperwork with his right hand.

Defendant does not identify a specific comment or testimony by Onofre that is objectionable; nor does he explain how he is prejudiced by any alleged objectionable comment. Moreover, with respect to the testimony regarding the suspected bandage seen in the Walmart video, defendant did not dispute this observation. Onofre did not opine subjectively as to why the injuries were there or what caused the injuries. Rather, this "objective, factual comment . . . set [] the stage for the factfinder to reach its own conclusion." Id. at 603.

Moreover, the issue of whether defendant's injuries were incurred when he sawed up the body or prior to doing so does not prejudice defendant because he did not dispute dismembering T.C.'s remains. Further, injury to defendant's hands was consistent with the defense theory that his hands were injured during the burglary. As defense counsel argued in summation, one would use their right, dominant hand to protect oneself.

With respect to any head injury, defendant agreed that no head injury showed up in a photograph from the video surveillance. Defendant offered the testimony of Dr. Fishman to show that a head injury could still occur even if there was no outward manifestation in a photograph or video. Thus, defendant did not reasonably dispute Onofre's observations regarding the injuries or lack thereof in the Walmart or U-Haul videos. Id. at 604.

E. Jury Instructions Regarding Flight.

Defendant contends the trial court erred in instructing the jury on flight because "there [was] no evidence [] defendant knew there was a warrant for his arrest," and that his "departure [was] not indicative of flight."

We review a trial court's decision to instruct the jury on flight for an abuse of discretion. State v. Long, 119 N.J. 439, 499 (1990). Only if the decision to give the instruction "was so wide of the mark that a manifest denial of justice resulted" is reversal warranted. State v. Marrero, 148 N.J. at 484 (quoting State v. Kelly, 97 N.J. 178, 216 (1984)).

Appropriate and proper jury instructions are essential for a fair trial. State v. Scharf, 225 N.J. 547, 581 (2016). When a defendant alleges error in the jury charge, the charge must be reviewed as a whole. State v. Loftin, 146 N.J. 295, 379 (1996). "An erroneous jury charge 'when the subject matter is fundamental and essential or is substantially material' is almost always considered prejudicial." State v. Maloney, 216 N.J. 91, 104-05 (2013) (quoting State v. Green, 86 N.J. 281, 291 (1981)).

"Flight from the scene of a crime, depending on the circumstances, may be evidential of consciousness of guilt, provided the flight pertains to the crime charged." State v. Randolph, 228 N.J. 566, 594 (2017). A flight charge "is

A-0840-22

appropriate when there are 'circumstances present and unexplained which . . . reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt.'" State v. Latney, 415 N.J. Super. 169, 175-76 (App. Div. 2010) (omission in original) (quoting State v. Mann, 132 N.J. 410, 418-19 (1993)). The circumstances need not constitute unequivocal proof of a consciousness of guilt, but it "must be 'intrinsically indicative of'" such consciousness. Randolph, 228 N.J. at 595 (quoting State v. Randolph, 441 N.J. Super. 533, 562 (App. Div. 2015)).

In this case, the evidence demonstrated that defendant dismembered T.C.'s body, drove it to another location, and set it on fire. Defendant was later seen getting into a taxi with luggage. After T.C.'s remains were found, he was apprehended at a hotel near the Atlantic City International Airport with two bags. The trial court did not err in concluding that this evidence presented circumstances "reasonably justify[ing] an inference that" defendant fled "with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt." Latney, 415 N.J. Super. at 175-76 (quoting Mann, 132 N.J. at 418-19).

Defendant's argument that the flight charge was unwarranted because he had no knowledge of his pending arrest is unavailing. Evidence of flight need

not establish that an accused is fleeing from custody or hiding from authorities. State v. Wilson, 57 N.J. 39, 49 (1970). Rather, "[a] jury may infer that a defendant fled from the scene of a crime by finding that he departed with an intent to avoid apprehension for that crime." Ibid. The substantial, credible evidence in the record supports the trial court's decision to instruct the jury on flight.

In sum, we discern no errors in the issues raised by defendant warranting reversal of his convictions. Thus, we reject defendant's assertions of cumulative error.

## III.

### A. Sentencing Error.

Defendant challenges his sentence of life imprisonment. He contends the sentencing court erred by improperly applying aggravating factor one, N.J.S.A. 2C:44-1(a)(1), "[t]he nature and circumstances of the offense, and the role of the actor in committing the offense, including whether or not it was committed in an especially heinous, cruel or depraved manner . . . ." Defendant argues that the sentencing court's finding of this factor was double-counting elements of the murder conviction. This argument is without merit.

48

"Trial judges are given wide discretion in imposing sentence." State v. McGuire, 419 N.J. Super. 88, 159-60 (App. Div. 2011) (citing State v. Bieniek, 200 N.J. 601, 607-08 (2010)). Thus, our review of the sentencing court's imposition of a sentence is guided by an abuse of discretion standard. State v. Torres, 246 N.J. 246, 258 (2021). We defer to the sentencing court's factual findings and should not "second-guess" them. State v. Case, 220 N.J. 49, 65 (2014) (citing State v. Natale, 184 N.J. 458, 489 (2005)). If the sentencing court "follow[ed] the Code and the basic precepts that channel sentencing discretion," the reviewing court should affirm the sentence, so long as the sentence does not "shock the judicial conscience." Ibid. (quoting State v. Roth, 95 N.J. 334, 365 (1984)).

"Aggravating factor one requires the trial court to consider '[t]he nature and circumstances of the offense, and the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner.'" State v. Miller, 237 N.J. 15, 29 (2019) (alteration in original) (quoting N.J.S.A. 2C:44-1(a)(1)). "When applying factor one, 'the sentencing court reviews the severity of [] defendant's crime, the single most important factor in the sentencing process, assessing the degree to which defendant's conduct has threatened the safety of its direct victims and the public.'" Ibid. (quoting State

49

v. Lawless, 214 N.J. 594, 609 (2013)) (internal quotation marks omitted). "When it assesses whether a defendant's conduct was especially 'heinous, cruel, or depraved,' a sentencing court must scrupulously avoid 'double-counting' facts that establish the elements of the relevant offense." State v. Fuentes, 217 N.J. 57, 74-75 (2014) (citing State v. Yarbough, 100 N.J. 627, 645 (1985)). Nevertheless, "[a] sentencing court may consider 'aggravating facts showing that [a] defendant's behavior extended to the extreme reaches of the prohibited behavior.'" Miller, 237 N.J. at 25 (alterations in original) (quoting Fuentes, 217 N.J. at 75). "Thus, '[i]n appropriate cases, a sentencing court may justify the application of aggravating factor one, without double-counting, by reference to the extraordinary brutality involved in an offense.'" Id. at 30 (alteration in original) (quoting Fuentes, 217 N.J. at 75).

Here, the sentencing court explained why the circumstances surrounding T.C.'s death were particularly heinous, cruel, and depraved:

> The proofs establish that [T.C.'s] death was caused after her skull was fractured by inflicted blunt force, and her body was shortly thereafter dismembered in the home of Mr. Parrish in Vineland . . . . Those actions were heinous, cruel and depraved but the brutality and the depravity didn't end there at Mr. Parrish's home in Vineland. The proofs clearly establish that shortly before [T.C.'s] body was discovered in Lawrence Township, Mr. Parrish was captured on video buying tools, returning tools, buying new tools, renting a truck,

50

all of which were used to remove, package and transport [T.C.'s] remains from his home in Vineland to a farm field in Cedarville . . . and that's where [T.C.'s] remains were basically dumped like trash, and they were set afire . . . .

And after that action on July 2nd, as was referenced by the State and the defense, Mr. Parrish drove back towards Vineland, where he was captured on video again, stopping at a convenience store to buy himself a sandwich. The act of buying a sandwich in a convenience store is something everyone probably has done, but not under these circumstances. And under these circumstances, all of these actions, culminating in what I just mentioned, were clearly heinous, cruel and depraved, and that's obvious to anyone privy to the information that was presented at this trial.

We are satisfied the court acted within its discretion in considering this aggravating factor for the murder and acts of desecration of T.C.'s body. See State v. Boyer, 221 N.J. Super. 387, 405-06 (App. Div. 1987).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0840-22